**UNITED STATES of America,
Plaintiff,**

v.

**RAYMOND & WHITCOMB
CO., Defendant.**

No. 97 Civ. 7077(CBM).

United States District Court,
S.D. New York.

June 19, 1999.

---

Mary Jo White, United States Attorney for the Southern District of New York, New York City, by Jonathan A. Willens, for plaintiff.

Hertzog, Calamari & Gleason, New York City, by William Simon, for defendant.

*OPINION ON SUMMARY JUDGMENT*

MOTLEY, District Judge.

The United States of America, on behalf of the United States Postal Service, alleges that Raymond & Whitcomb Co. (hereinafter, "R & W") illegally used the non-profit mail rate for 6.1 million mailings not eligible for that rate, causing the Postal Service to suffer a deficiency of $398,960.05. The United States has brought this civil action under the Federal Debt Collection Procedure Act, 31 U.S.C. § 3001 *et seq.* (Count I), unjust enrichment common law (Count II), and the False Claims Act, 31 U.S.C. § 3729 *et seq.* (Count III). The United States seeks actual damages, treble damages, and a civil penalty of at least $5,000 for each of 753 false mailing statements. Both parties have moved for summary judgment. For the reasons given below, summary judgment is granted to the United States on Count I (Federal Debt Collection Procedure Act) and Count II (unjust enrichment). Summary judgment is denied to both parties in all other respects.

## I. BACKGROUND

Except as otherwise noted, the facts in this section are undisputed. R & W, a New York corporation, is a commercial travel agency that specializes in cruises and tours for institutional clients and their members. Compl. ¶ 6; Answer ¶ 6. R & W works almost exclusively with non-profit institutions, such as the Metropolitan Museum of Art (hereinafter, "Met") and the Smithsonian Institution (hereinafter, "Smithsonian") (collectively, "Institutions"), on travel programs that advance their educational missions. Def.'s R. 56.1 Stmt. ¶ 2.[1] R & W does not provide conventional retail travel services to the public. Def.'s R. 56.1 Stmt. ¶ 1.

From November 1, 1992 to August 31, 1996 (hereinafter, "complaint period"), R &

W played a role in the operation of each Institution's travel tour programs. Pl.'s R. 56.1 Stmt. ¶ 1. Targeting its members, each Institution made its tours educational in focus. "The objective of the Smithsonian study tour program is to provide special opportunities for Smithsonian members to learn about the history and culture of other areas of the world through travel with scholars and authorities provided by the Institution.... The focus of a Smithsonian study tour is educational." Def.'s R. 56.1 Stmt. ¶¶ 4, 26. "The Metropolitan travel program is essentially the same as the Smithsonian study tour program, with education of Metropolitan members and the advancement of the educational mission of the Metropolitan as its goal." Def.'s R. 56.1 Stmt. ¶ 30. The Smithsonian tours are available only to its members, with Smithsonian personnel dictating the basic tour blueprint, helping staff the tour, and scrutinizing and approving all aspects of the tour. Def.'s R. 56.1 Stmt. ¶¶ 6–8, 11–15, 18–19, 22. "The Metropolitan has final approval over every facet of its travel program." Def.'s R. 56.1 Stmt. ¶¶ 31–32. The Met tours were at least "primarily for members" of the Met, and members were the targets of the brochure mailings that the Met directed. Compl. ¶ 21; Def.'s R. 56.1 Stmt. ¶ 32.

R & W's work for the tour programs included the following: helping plan itineraries; procuring and paying for cruise ship, hotel, and tour reservations; hiring travel staff; and, in the actions at issue here, printing and mailing brochures and tour bulletins (hereinafter, "disputed mailings"). Pl.'s R. 56.1 Stmt. ¶¶ 7–9. R & W's financial gain or loss from its work with the Institutions depended on the number of paying participants in the tours. Pl.'s R. 56.1 Stmt. ¶¶ 10–13. R & W had each tour priced so as to earn R & W a profit, and most tours generated a profit of $100,000 to $300,000 for R & W. Pl.'s R.

---

1. Except as otherwise noted, citations to paragraphs in "Pl.'s R. 56.1 Stmt." or "Def.'s R. 56.1 Stmt." also refer to the other party's responses to the cited paragraphs, and therefore are citations to undisputed facts.

56.1 Stmt. ¶¶ 11–14. R & W also bore a risk of financial loss when trips were canceled, and at least one canceled tour did cause R & W to suffer a loss. Pl.'s R. 56.1 Stmt. ¶¶ 10, 13.

The disputed mailings included 6.1 million pieces of mail in 753 separate submissions to the Postal Service during the complaint period. Pl.'s R. 56.1 Stmt. ¶¶ 2, 3.[2] For the disputed mailings, R & W paid the postage as well as the costs of printing the brochures and bulletins. Pl.'s R. 56.1 Stmt. ¶¶ 6, 7. R & W hired St. John Associates, Inc. (hereinafter, "St.John"), a mailing agent, to submit the mailings to the Postal Service. Pl.'s R. 56.1 Stmt. ¶ 15. All disputed mailings were mailed at the non-profit standard mail rate (formerly, the special bulk third-class rate) (hereinafter, "non-profit rate"), which is available only to authorized non-profit organizations such as the Institutions. Pl.'s R. 56.1 Stmt. ¶ 4. At the non-profit rate, postage for the disputed mailings was $398,960.05 cheaper than it would have been at the regular third-class bulk rate. Pl.'s R. 56.1 Stmt. ¶ 5.

For each of the 753 submissions, St. John signed the required Postal Service mailing statement claiming that, under applicable Postal Service regulations, the mailed material was eligible for the non-profit rate. Pl.'s R. 56.1 Stmt. ¶¶ 3, 17, 18. St. John, acting in accord with instructions it received from R & W, claimed such eligibility by listing either the Met or the Smithsonian, but not R & W, as the holder of the non-profit permit that allowed the use of the non-profit rate. Pl.'s R. 56.1 Stmt. ¶¶ 16, 19, 20. While the Met and the Smithsonian each had such a permit, R & W, which was not a non-profit entity, never did. Pl.'s R. 56.1 Stmt. ¶¶ 19, 22. St. John sent, along with its own invoice, each mailing statement to R & W. Pl.'s R. 56.1 Stmt. ¶ 21.

By 1991, R & W knew of the Postal Service regulations on cooperative mailings and knew that the Postal Service had investigated the eligibility for the non-profit rate of Met and Smithsonian travel mailings. Pl.'s R. 56.1 Stmt. ¶¶ 24, 25. R & W argues that these Postal Service investigations vindicated the sort of travel-related mailings at issue here. Def.'s Resp. to Pl.'s R. 56.1 Stmt. ¶ 26. R & W asserts that in hiring and instructing St. John, it merely acted on behalf of, and under instructions from, the Institutions to help the Institutions mail brochures to their own members under their own non-profit mailing permits. Def.'s Resp. to Pl.'s R. 56.1 Stmt. ¶¶ 15–16, 26.

## II. ANALYSIS

### A. Summary Judgment Standards

The basic summary judgment standard is that "[u]ncertainty as to the true state of any material fact defeats the motion." *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir.1989). The non-moving party's burden is to produce concrete evidence sufficient to establish a genuine unresolved material issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988). The court then must view the facts in the light most favorable to the non-movant. *SeeMatsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994). The court neither weighs evidence nor resolves material factual issues, but only determines whether, after adequate discovery, any such issues remain unresolved because a reasonable fact finder could decide for ei-

---

**2.** The United States alleges that of the 6.1 million mailings, over 3.5 million were for the Met and over 2.5 million were for Smithsonian. Compl. ¶¶ 20, 22. While it is unclear to what extent R & W admits this breakdown of the 6.1 million total, it is sufficient for present purposes that R & W admits that the 6.1 million included mailings for both the Met and the Smithsonian. Answer ¶¶ 20, 22; Def.'s Resp. to Pl.'s R. 56.1 Stmt. ¶ 2.

ther party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Gibson,* 892 F.2d at 1132.

## B. Prohibition on Using Non–Profit Rate for Cooperative Mailings

Each Institution, a non-profit entity, qualifies for the non-profit rate; R & W, a for-profit commercial entity, does not. The Domestic Mail Manual (hereinafter, "DMM"),[3] which is adopted as a Postal Service regulation, *see* 39 C.F.R. §§ 111.1, 111.5, 211.2(a)(2), prohibits use of the non-profit rate when the mailings are for a cooperative venture between a non-profit and a for-profit entity. "An organization authorized to mail at the Nonprofit Standard Mail rates may mail only its own matter at those rates. An authorized organization may not lend the use of its authorization to mail at the Nonprofit Standard Mail rates to any other person or organization." *DMM* § E670.5.1. "No person or organization may mail, or cause to be mailed ..., any ineligible matter at the Nonprofit Standard Mail rates." *DMM* § E670.5.2. "A cooperative mailing may be made at the Nonprofit Standard Mail rates only when each of the cooperating organizations individually is authorized." *DMM* § E670.5.3. *See also Siebert v. Conservative Party of N.Y.,* 724 F.2d 334, 335–36 (2d Cir.1983) ("An organization which qualifies for the special rates may only mail its own matter at these rates. Moreover, cooperative mailings may only be made at the special rates when each organization individually qualifies for the use of the special rates.") (citing DMM).

■ The question is whether the disputed mailings were truly the mailings of each Institution or instead were cooperative mailings of each Institution in conjunction with R & W.[4] R & W asserts that it was not a joint venturer with the Institutions, but merely their agent, aiding in the execution of non-profit activities that the Institutions controlled. The cooperative mailing inquiry certainly looks to traditional agency principles. *See* Richards Decl. Ex. A, *Customer Support Ruling PS–209,* July 1989, updated Oct. 1996 (hereinafter, "PS–209") ("A cooperative mailing may be considered proper if the authorized organization uses a for-profit entity ... as an agent."). "[T]raditional indicia of an agency relationship include '(1) consent; (2) fiduciary duty; (3) absence of gain or risk to the agent; and (4) control by the principal.'" *Berger v. Iron Workers Reinforced Rodmen Local 201, et al.,* 843 F.2d 1395, n. 29 (C.A.D.C. 1988) (citation omitted). However, in agency law, "control by the principal" often is the most critical consideration, while in the cooperative mailing inquiry, "absence of gain or risk to the agent" often is more important, and various other factors are relevant as well.

---

**3.** The quoted portions of the Domestic Mail Manual are the same in the 1999 version, *see DMM* Issue 54, January 10, 1999, and the 1996 version, *see DMM* Issue 50, July 1, 1996.

**4.** R & W argues that the cooperative mailing inquiry does not apply because statute and regulation explicitly permit the non-profit rate for travel-related mailings. Under the cited rule, an organization cannot use the non-profit rate for mail that "announces the availability of ... any travel arrangement, unless the organization ... is authorized to mail at the [nonprofit] rates[,] ... the travel contributes substantially ... [to] the purposes ... for the organization's authorization[,] ... and the arrangement is designed for ... members, donors, supporters, or beneficiaries" of the organization. 39 U.S.C. § 3626(j)(1)(C);

*DMM* § E670.5.4(c) (same quoted language as statute).

This rule in no way broadens the right to use the non-profit rate for travel mailings that otherwise would be ineligible *cooperative* mailings. Rather, it establishes that the non-profit rate *"shall not* apply" to "any travel arrangement, *unless* the organization ... is authorized" and the travel endeavor is a legitimate non-profit endeavor. 39 U.S.C. § 3626(j)(1)(C) (emphasis added). *See also DMM* § E670.5.4 ("Nonprofit Standard Mail rates *may not* be used ...") (emphasis added). Essentially, it bars the non-profit rate for travel mailings, with an exception allowing the rate for truly non-profit endeavors. It thus has no effect on the cooperative mailing inquiry.

■ Risk-sharing is critical because to the extent that a for-profit entity substantively participating in a venture with a non-profit entity has a sizeable financial stake in the venture, that venture ceases to be a truly non-profit endeavor eligible for the non-profit rate. Rather, the venture becomes a cooperative endeavor, even if the non-profit entity retains final decision-making control over the venture. Mailings for a project involving a for-profit entity and a non-profit entity therefore generally are not eligible for the non-profit rate when the for-profit entity "shares in the costs, risks, and benefits of the mailing," such as when the for-profit entity's "revenues are linked to the success of the mailings." *United States Postal Serv. v. Univ. Publ'g Corp.*, 835 F.Supp. 489, 490–91 (S.D.Ind.1993) (upholding and applying Postal Service interpretation of cooperative mailing rule). In contrast, a for-profit entity's mail submissions may be eligible for the non-profit rate if it "does not share in any 'risks, costs, or benefits' and instead collects a fixed sum for a service." *Id.* at 493. This holding mirrors the Postal Service's position. *See* Richards Decl.Ex. C, *U.S. Postal Serv. Public'n 417A, Customer Guide to Cooperative Mailing*, Apr. 1990 (hereinafter, "Pub.417A") ("Typically, in a cooperative mailing one or more parties 'cooperate' with an authorized nonprofit organization to *share the cost, risk, or benefits* of the mailing.... In order to qualify for the special bulk rates, the mailing ... *must not benefit any other* person or organization." (emphasis added)).

Various other factors relating to not only risk-sharing, but also participation in the endeavor, distinguish the cooperative mailing inquiry from a pure agency law analysis. The Postal Service has established that it determines whether a mailing is cooperative by a multi-factor test that is not entirely coextensive with pure agency law considerations. The inquiry looks at:

The identity of the party that devised, designed, prepared, and paid for the mailpiece ... [and] the postage in the mailing; How the unauthorized parties are compensated; How the profits and revenues ... are divided ... [and] whether the parties share the risk; How managerial decisions are made ... and who makes those decisions; The contribution each participant makes ... (e.g., money, service, managerial decision making, etc.); The intent and interests of the participants; and, Any other evidence that may be relevant....

*PS–209. See also* Richards Decl.Ex. B, *U.S. Postal Serv. Public'n 417, Special Bulk Third–Class Rates*, Apr. 1990, at 3 ("A mailing may be determined to be an illegal cooperative mailing if an unauthorized organization participated in the preparation of the piece; paid the costs of printing or postage ...; or, compensated the authorized organization for the use of its permit."). Apart from these fluid factors, "the mailing must be owned by the authorized nonprofit entity at the time of the mailing in order to be mailed at the special rates." *PS–209. See also* Pub. 417A (stating same rule).

■ Here, a sizeable financial risk and reward from each travel tour program attached to R & W. R & W's financial fate from its work with the Institutions depended on the number of paying participants in each tour, with successful tours yielding up to a $300,000 profit for R & W and undersubscribed tours causing losses for R & W. Pl.'s R. 56.1 Stmt. ¶¶ 10–14. R & W also paid the postage costs as well as the costs of printing the brochures and bulletins in the disputed mailings. Pl.'s R. 56.1 Stmt. ¶¶ 6, 7. The Postal Service warns against using the non-profit rate in just such a "joint business venture" in which "[t]ypically, both parties contribute something (a list of names and use of the special rate authorization by the nonprofit party, and payment of printing/mailing costs by the commercial party) and both parties take something out (a share of the proceeds/profits)"; the Postal Service even lists, as an example, "[m]ailings which offer ... travel programs, or other services

provided by a commercial firm to members at group discount rates." *Pub. 417A.*

R & W's counter-arguments do not create material issues of fact here because they are simply disputes as to degree, such as the extent to which the Institutions bore "a much greater risk," Def.'s Mem. at 5, 20, and to which R & W "ultimately passed on to the traveling member" its costs, Def.'s Mem. at 19. The various considerations that R & W presses do not outweigh the substantiality of the R & W financial role. Even if the Institutions retained ultimate decision-making power, R & W contributed much of the substance of the travel programs. R & W served as the travel professional that helped shape the substance of the tours by helping with the selection of itineraries, cruise ships, hotels, tours, and travel staff. Pl.'s R. 56.1 Stmt. ¶¶ 7–9. It also is not critical whether the disputed mailings were submitted by R & W or by another entity, such as either Institution or St. John. R & W's cooperative stake in the venture establishes that the disputed mailings were submitted on behalf of R & W. The cooperative mailing rule prohibits any non-profit rate mailings " *'in behalf of or produced* for an organization not authorized to mail at the special bulk rates.' " *Owen v. Mulligan,* 640 F.2d 1130, 1133–34 (9th Cir.1981) (holding that qualifying political organization was not entitled to use its own permit for material supporting a non-qualifying candidate) (emphasis added).

In sum, even if the Institutions had total control and did the overwhelming share of the work, R & W's risk-, reward-, and expense-sharing still would make it a sufficiently weighty investor that it would be more than a mere functionary of the Institutions. Moreover, it is clear that R & W had more input into the substance of the endeavors than a mere silent investor would have. Accordingly, any reasonable fact finder would conclude that the disputed mailings were cooperative mailings between R & W and one of the Institutions, and therefore were ineligible for the nonprofit rate.

### C. Count I: Federal Debt Collection Procedure Act

The Federal Debt Collection Procedure Act, 28 U.S.C. § 3001 *et seq.* (hereinafter, "FDCPA"), "provides the exclusive civil procedures for the United States[ ] to recover a judgment on a debt." 28 U.S.C. §§ 3001(a), (a)(1). *See Nat'l Labor Relations Bd. v. E.D.P. Med. Comp. Sys.,* 6 F.3d 951, 954 (2d Cir.1993) ("The purpose of the Act was 'to create a comprehensive statutory framework for the collection of debts owed to the United States government,' in order to 'improve the efficiency and speed in collecting those debts.' Previously the United States collected debts according to the laws of the different states which impeded collection efforts." (quoting H.R.Rep. No. 736, 101st Cong., 2d Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6630, 6631; citing *id.* at 6631–33)).

Unpaid postage supports a claim under the FDCPA, which defines eligible "debt" as "an amount that is owing to the United States on account of a direct loan, or . . . a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond, or other source of indebtedness to the United States." 28 U.S.C. §§ 3002(3)(A), (B). As discussed above, any reasonable fact finder would conclude that R & W paid a lower postage rate than it should have for mailing services that it chose to procure. R & W therefore has "failed to raise an issue of material fact as to [the debt] . . ., and therefore that the government is entitled to judgment as a matter of law." *United States v. Werner,* 857 F.Supp. 286, 290 (S.D.N.Y.1994) (granting summary judgment to United States on tax debt claim). Accordingly, as to Count I, the United States's motion for summary judgment is granted.

### D. Count II: Unjust Enrichment

 The United States's unjust enrichment claim is that the Postal Service was not properly paid for providing the service of delivering the disputed mailings. There was no valid contract (express or implied in fact) between R & W and the Postal Service because, as discussed above, federal law bars use of the non-profit rate for the disputed mailings. "A promise to pay for services is sometimes implied by law, but this is done only when the court can see that they were rendered under such circumstances as authorized the party performing to entertain a reasonable expectation of their payment by the party soliciting the performance." *Davidson v. Westchester Gas–Light Co.*, 99 N.Y. 558, 566–67, 2 N.E. 892, 895 (1885) (citation omitted). More precisely, the United States's unjust enrichment claim is a quantum meruit claim for the value of services rendered, which is appropriate when there was no properly agreed-upon payment amount for agreed-upon provision of goods or services. *See, e.g., Douglas Constr., Inc. v. Marcais, et al.,* 239 A.D.2d 803, 804 657 N.Y.S.2d 835, 836–37 (3d Dept.1997) (holding, where plaintiff rendered construction services while contract was no longer valid, that "[i]n the absence of any binding contract and because the record establishes that plaintiff rendered services and labor and furnished materials under circumstances implying an understanding that defendants would be obligated to pay for same, plaintiff was entitled to recover on the theory of quantum meruit"); *Nassau v. Incorporated Village of Roslyn, et al.,* 218 A.D.2d 688, 631 N.Y.S.2d 42 (2d Dept.1995) (holding Village liable under quantum meruit for use of County sewage facility where Village and County agreed on Village's use of facility but not on price).

 " '[T]o make out a claim in quantum meruit, a claimant must establish (1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.' " *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.,* 171 A.D.2d 479, 567 N.Y.S.2d 404 (1st Dept.1991) (quoting *Moors v. Hall,* 143 A.D.2d 336, 337–38, 532 N.Y.S.2d 412, 414 (2d Dept. 1988)). "As a general rule, the performance and acceptance of services gives rise to the inference of an implied contract to pay for the reasonable value of such services." *Moors v. Hall,* 143 A.D.2d 336, 338, 532 N.Y.S.2d 412, 414 (2d Dept.1988) (holding man liable to woman who performed domestic and other services for him while they were romantically involved). The Postal Service's provision of mailing services for R & W, without proper payment, satisfies all quantum meruit elements. Accordingly, as to Count II, the United States's motion for summary judgment is granted.

### E. Count III: False Claims Act

 The United States bases its cause of action under the False Claims Act, 31 U.S.C. § 3729 *et seq.,* on the allegation that R & W submitted to the Postal Service 753 mailing statements falsely certifying that the disputed mailings were not cooperative mailings and failing to disclose R & W's role. While a typical False Claims Act action alleges an excessive payment *from* the United States to the defendant, the statute also supports a "reverse false claim" action alleging an insufficient payment to the United States from the defendant. Any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government" is liable under 31 U.S.C. § 3729(a)(7).

 "A claim under § 3729(a)(7) requires proof: (1) that the defendant made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to the United States; (2) that the statement or record was false; (3) that

the defendant knew that the statement or record was false; and (4) that the United States suffered damages as a result." *Wilkins ex rel. United States v. Ohio,* 885 F.Supp. 1055, 1059 (S.D.Ohio 1995) (citing *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259 (S.D.Fla.1989)). Any reasonable fact finder would find the requisite falsity because, as discussed earlier, the mailing statements claimed that the disputed mailings were eligible for the non-profit rate as mailings of only each sponsoring Institution, when in fact they were cooperative mailings with R & W.

### a. Causation of the Falsity

■■■■ R & W asserts that the mailing statements were the work of St. John, on behalf of the Institutions, and that the decision to use the non-profit rate was that of the Institutions. As discussed above, however, R & W was a participant in the venture, not just a functionary of the Institutions. It was R & W that hired St. John to complete and submit the mailing statements; R & W also instructed St. John to claim the non-profit rate by listing only the Institutions as the mailers. This is sufficient for R & W to be liable even though it was St. John that actually completed and submitted the mailing statements. "[T]he statute is violated not only by a person who makes a false statement or a false record . . . , but also by one who engages in a fraudulent course of conduct that causes the government" to lose money by honoring a false claim. *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 439 (S.D.N.Y.1995).

■■■■ False Claims Act liability attaches not only to the actual maker of the false statement, but also to "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government" or only had contact with the government through an "intermediary." *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 544–45, 63 S.Ct. 379, 384, 87 L.Ed. 443 (1943) (upholding finding of liability). *See also United States v. Veneziale,* 268 F.2d 504, 505 (3d Cir.1959) (holding that liability may attach to party who fraudulently induces a contract that results in a government payment). The statute also "gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim." *United States v. Bornstein,* 423 U.S. 303, 309, 96 S.Ct. 523, 528, 46 L.Ed.2d 514 (1976) (holding defendant liable for causing other contractor to submit false claims). *See also United States ex rel. Davis v. Long's Drugs, Inc.,* 411 F.Supp. 1144, 1148 (S.D.Cal.1976) (quoting *id.*); *Woodbury v. United States,* 232 F.Supp. 49 (D.Or.1964) (holding principal liable for agent's false claim because principal knew of and "knowingly participated in the making of the claim"), *rev'd on other grounds,* 359 F.2d 370 (9th Cir. 1966). Accordingly, whether St. John was an agent of R & W, or a separate entity following instructions from R & W, R & W sufficiently participated in the false statements that it "cause[d] to be used . . . [a] statement . . . to the government." 31 U.S.C. § 3729(a)(7).

### b. Obligation to the United States

■■■ The presence of the requisite obligation to the United States is evident from the contrast between the present case and *United States v. Q Int'l Courier, Inc.,* 131 F.3d 770 (8th Cir.1997). The reverse false claims action in *Q Int'l* was essentially identical to the present suit, except that it addressed impermissible use of a favorable international mail rate, not, as here, impermissible use of a favorable non-profit mail rate. The Eighth Circuit held that the statutes, regulations, and other published Postal Service rules on eligibility for discounted international mail rates "serve[ ] only to release the Postal Service from an obligation, not to impose an obligation on anyone to pay postage." *Id.* at

773. Thus, although the wrongful use of the international rates "might well support a judgment that ... defendants engaged in illegal and fraudulent activity," it did not inherently create an obligation to pay the higher domestic mail rate. *Id.* In contrast, as to the non-profit rate at issue here, the required Postal Service mailing statement explicitly states that "[t]he signature of a mailer certifies that ... (5) it will be liable for and agrees to pay, subject to appeals prescribed by postal laws and regulations, any revenue deficiencies assessed on this mailing, whether due to a finding that the mailing is cooperative or for other reasons." *See* Willens Decl.Ex. 12.

A finding of wrongful use of the non-profit rate yields a clear actual obligation to pay the deficiency, unlike a finding of wrongful use of the international rate at issue in *Q Int'l. Q Int'l* explicitly made such a distinction, stating that if the applicable postal rules actually "created a duty to pay full domestic postage as to each piece of mail sent ... [, w]e are satisfied as a legal matter that such a duty would qualify as an 'obligation' under the False Claims Act." *Q Int'l,* 131 F.3d at 773. The non-profit rate postal rules at issue here are exactly the sort of clearer postal rules that *Q Int'l* envisioned as sufficient to create an obligation to pay for a deficiency stemming from a finding that the more favorable rate was used improperly. Accordingly, R & W's wrongful use of the non-profit rate created an obligation to the United States sufficient for a reverse false claims action.

### c. Knowledge of Falsity

■ The difficult question regarding R & W's False Claims Act liability is whether R & W *knowingly* caused the falseness of the mailing statements submitted to the Postal Service. R & W argues that it relied on the Institutions' expertise in non-profit rate eligibility and St. John's expertise in postal submissions. Most significant is R & W's assertion that it reasonably followed the view of the Institutions, which are non-profit entities that hold the requisite non-profit rate permit, that the disputed mailings qualified for the non-profit rate. "The Act's scienter requirement is something less than that set out in the common law" for fraud-based causes of action. *Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412, 1420 (9th Cir. 1992). *Accord Wilkins ex rel. United States v. Ohio,* 885 F.Supp. 1055, 1060 (S.D.Ohio 1995) (quoting *Wang* for proposition that "the scienter requirement is something less than the elements of fraud at common law"). The statute delineates the standard as follows:

(b) Knowing and knowingly defined.—For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).

■ Under this standard, "[t]he requisite intent is the knowing presentation of what is known to be false." *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 985 F.2d 1148 (2d Cir.1993) (quoting *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991)). The United States "need not prove an intent to defraud, but only that the violations were committed knowingly, that is with willful blindness to the existence of a fact or reckless disregard for the truth." *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 439 (E.D.N.Y. 1995). "[W]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either 'fraudulent' or simply 'false.' ... What is crucial—and

what must be proven at trial—is that the [defendant] knew that the information was false.... Innocent mistake is a defense.... So is mere negligence. The statutory definition of 'knowingly' requires at least 'deliberate ignorance' or 'reckless disregard.'" *Hagood*, 929 F.2d at 1421. Because other elements of the United States's cause of action under the False Claims Act are satisfied, both sides' motions for summary judgment on this count turn on the scienter element.

### 2. Raymond & Whitcomb's Motion for Summary Judgment

■ The United States survives R & W's motion for summary judgment with evidence sufficient to "raise a fact question regarding whether Defendant ... knew the substance of the false forms." *United States v. Oakwood Downriver Med. Ctr.*, 687 F.Supp. 302, 309 (E.D.Mich.1988) (denying summary judgment to reverse false claims defendant). *Compare id. with Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir.1992) (granting summary judgment to defendant because, with negligence insufficient for liability, "[b]ad math is no fraud[,] ... [p]roof of one's mistakes or inabilities is not evidence that one is a cheat[,] ... [and] the common failings of engineers and other scientists are not culpable under the Act"). R & W's argument that it lacked the requisite scienter because it relied on the Institutions' non-profit expertise is insufficient to compel a reasonable fact finder to rule in its favor.

The certification that the signer of a mailing statement adopts creates a duty to investigate whether the material qualifies for the non-profit rate or is a cooperative mailing. One who signs a certification cannot choose to remain unaware of the veracity of that certification like the proverbial ostrich who buried its head in the sand so as to see no evil, hear no evil, and speak no evil. Thus, a failure to conduct a proper investigation before making a false statement may be sufficiently reckless to yield False Claims Act liability. *See, e.g.,*

*United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998) (holding that defendant who had not properly tested the nonconforming goods it sold the United States had a reckless disregard for the falsity of its claim for payment); *United States v. Krizek*, 111 F.3d 934 (D.C.Cir.1997) (holding that psychiatrist and wife acted with reckless disregard in submitting incorrect billings where wife made implausibly high volume of submissions and psychiatrist failed to review the submissions).

Moreover, as stated above, any reasonable fact finder would conclude that the mailing statements were false in their certifications that the disputed mailings were not cooperative mailings; they were cooperative mailings. The clarity of the falsity supports the United States's position that a failure to know of the falsity was at least reckless. Thus, a reasonable fact finder could conclude that R & W "had at least a reckless disregard for the falsity of its claims." *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir.1998). Accordingly, as to Count III, R & W's motion for summary judgment is denied.

### 3. The United States's Motion for Summary Judgment

The United States's evidence is sufficient only to allow, not to compel, a reasonable fact finder to conclude that R & W acted "knowingly" within the meaning of the False Claims Act. Where the alleged falsity is an inaccurate certification of compliance with a legal requirement, the United States must prove, if not intent to deceive, at least reckless or "willful blindness to the existence of a fact." *United States v. Inc. Village of Island Park*, 888 F.Supp. 419, 439 (E.D.N.Y.1995). Both the Met and the Smithsonian are respected, established, well-funded non-profit institutions. A reasonable fact finder could conclude that R & W, in relying on the Institutions' expertise as to nonprofit rate eligibility, acted unjustifiably and negligently, but not recklessly or in deliberate ignorance. Such a finding would be insuf-

ficient for False Claims Act liability because "[w]hat is crucial—and what must be proven at trial—is that the [defendant] knew that the information was false.... Innocent mistake is a defense.... So is mere negligence. The statutory definition of 'knowingly' requires at least 'deliberate ignorance' or 'reckless disregard.'" *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991). *See also Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412, 1420–21 (9th Cir.1992) (granting defendant summary judgment because evidence supported a finding of only negligent, not reckless, falsity). Accordingly, as to Count III, the United States's motion for summary judgment is denied.

### III. CONCLUSION

For the reasons given above, the United States's motion for summary judgment is granted in part and denied in part while R & W's motion for summary judgment is denied in its entirety. The United States is granted summary judgment on Count I (Federal Debt Collection Procedure Act) and Count II (unjust enrichment). This judgment is in the amount of $398,960.05, the undisputed difference in postage between the regular rate and the non-profit rate. Pl.'s R. 56.1 Stmt. ¶ 5. Summary judgment is denied to both parties in all other respects.