**UNITED STATES of America, ex rel. Daniel FELDMAN, Plaintiff/Relator,**

v.

**Wilfred VAN GORP and Cornell University Medical College, Defendants.**

No. 03 Civ. 8135(WHP).

United States District Court, S.D. New York.

Dec. 7, 2009.

Michael J. Salmanson, Esq., Salmanson Goldshaw, PC, Philadelphia, PA, for Plaintiff/Relator.

Nina Beattie, Esq., Brune & Richard LLP, New York, NY, for Defendant Dr. Van Gorp.

Tracey Tiska, Esq., Hogan & Hartson LLP, New York, NY, for Defendant Weill Medical College.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge.

Relator Daniel Feldman ("Feldman") brings this *qui tam* action on behalf of the United States pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., claiming that Dr. Wilfred van Gorp ("van Gorp") and Cornell University Medical College ("Cornell" and, collectively, "Defendants") submitted false claims to obtain federal research funds administered by the National Institutes of Health (the "NIH"). Defendants move for summary judgment dismissing this action. For the following reasons, Defendants' motion is denied.

## BACKGROUND

In April 1997, van Gorp, a professor of psychiatry at Cornell University, applied for a training grant from the NIH. (Defendants' Local Rule 56.1 Statement of Undis-

puted Facts dated Jan. 9, 2009 ("56.1 Stmt.") ¶¶ 57, 71; Declaration of Tracey A. Tiska dated Jan. 9, 2009 ("Tiska Decl.") Ex. U: Application for MH19998, Neuropsychology of HIV/AIDS Fellowship (Bates-stamped NIH 000301–000392).) His grant application sought funding for a "Neuropsychology of HIV/AIDS Fellowship" ("Grant Application"). (56.1 Stmt. ¶ 60.) Van Gorp proposed that:

> [f]ellows will be trained in child and adult clinical and research neuropsychology with a strong emphasis upon research training with HIV/AIDS. Fellows will be assigned a primary mentor/research project and a secondary project during their Fellowship. Fellows' progress will be monitored by the Training Committee, which will meet monthly. To mirror the breadth of exposure to a diverse population of HIV infected individuals in Manhattan, we will recruit a diverse applicant pool for our Fellowship, including women and people of traditionally under-represented groups.

(Grant Application at NIH 000302.) Van Gorp also indicated that Fellows would "devote an average of 75% of their time to research and … 25% [of their] time to clinical work with … HIV/AIDS [patients] and other neuropsychiatric disorders." (Grant Application at NIH 000344.) Van Gorp specified that the majority of the Fellows' clinical work would be with HIV-positive individuals. (Grant Application at NIH 000344.) Defendants' Grant Application also detailed a curriculum of "several formal, core didactic courses" and a number of electives. (Grant Application at NIH 000345.) Van Gorp identified himself as "Principal Investigator" and thirteen others as "Primary Faculty." (Grant Application at NIH 000302.) In addition to the Department of Psychiatry at Cornell, van Gorp listed the Center for Special Studies at New York Hospital (N.Y.H)-

Cornell Medical Center, Gay Men's Health Crisis, Memorial Sloan Kettering Cancer Center, and St. Vincent's Hospital and Medical Center as clinical resources. (Grant Application at NIH 000336.)

The NIH grant review process begins with assignment of a grant application to an Initial Review Group ("IRG") consisting of twenty independent scientists, who are recognized experts in the field related to the application. (56.1 Stmt. ¶¶ 12, 13, 61.) NIH assigned van Gorp's Grant Application to an IRG focused exclusively on National Institute of Mental Health ("NIMH") applications related to HIV/AIDS. (56.1 Stmt. ¶ 61.)

An IRG's evaluative process starts with a preliminary review of a grant application by three IRG members. (56.1 Stmt. ¶ 15.) Comments by the three initial reviewers are submitted to the entire IRG. All twenty IRG members then evaluate the application for themselves and score it based on scientific and technical merit. (56.1 Stmt. ¶ 16.) The individual scores from each IRG member are averaged to arrive at a "priority score." (56.1 Stmt. ¶ 63.)

Van Gorp's application received a very high priority score of 159. (56.1 Stmt. ¶ 64.) In conjunction with its priority score, the IRG submitted a thirteen-page Summary Statement describing van Gorp's Grant Application as seeking "establishment of a fellowship training program in the neuropsychology of HIV infection." (Tiska Decl. Ex. V: Summary Statement for Application Number 1 T32 MH19998–01 dated Sept. 15, 1997 ("Summary Statement") at NIH 000288.) It praised van Gorp and the training faculty as "experienced clinicians and productive researchers," and characterized them as "an exceptionally strong group of investigators to serve as role models." (Summary Statement at NIH 000288.) The Summary Statement opined

that the Grant Application set out "a well conceived training program, a broad range of ongoing research programs and models, and a diverse clinical population available for study." (Summary Statement at NIH 000288.)

However, the Summary Statement questioned van Gorp's focus on HIV/AIDS, noting under a subheading "Overemphasis on Neuropsychology unrelated to HIV/AIDS":

> If training in Neuropsychology at CUMC is the cornerstone of these other training programs, and if the proposed training program is to be piggy-backed upon the existing programs (as it appears to be in large measure), the new HIV/AIDS Fellows may get too much clinical work and training in neuropsychology, compared to the desired research training in HIV/AIDS. A final concern is that since the Fellows' stipends will be supplemented for providing clinical services, their research experiences may be compromised."

(Summary Statement at NIH 000295.) The Summary Statement also recommended limiting funding to two fellows, not three as requested by Defendants, because there were only two neuropsychologists among the core faculty. (56.1 Stmt. ¶ 65; Summary Statement at NIH 000289.)

Based on the Summary Statement's recommendation, NIMH approved funding for two fellows and recommended support for an additional four years. (56.1 Stmt. ¶ 69; Tiska Decl. Ex. Y: Notice of Grant Award dated Sept 30, 1997 ("Notice of Grant") at NIH 000198–99.) The Notice of Grant stated that funding was conditioned on the "application submitted to, and as approved by, the [Public Health Service] on the above titled project and is subject to the terms and conditions incorporated either directly or by referenc[e]" in the applicable grant program legislation and regulations. (Award Notice at NIH 000198.) The Notice of Grant did not specify any additional restrictions or protocols to implement the fellowship. (Notice of Grant at NIH 000198.)

After the Fellowship program commenced, one of the primary sources of HIV-positive research subjects contemplated by the Grant Application—Dr. Judith Rabkin's cohort—became unavailable. (56.1 Stmt. ¶¶ 140–41.) Van Gorp attempted to compensate for loss of the Rabkin cohort by securing additional research grants for HIV-positive subjects and identifying a cohort of older, HIV-positive adults at UCLA. (56.1 Stmt. ¶¶ 97, 142–44.)

After initial funding, Cornell and van Gorp submitted renewal applications for continued funding for subsequent years. (56.1 Stmt. ¶ 86.) Each renewal application required a progress report describing the Fellows' activities for the preceding twelve-month period. (56.1 Stmt. ¶ 87; Tiska Decl. Ex. PP: Application for Continuing Grant dated Jan. 21, 1998; Tiska Decl. Ex. QQ: Application for Continuing Grant dated Jan. 21, 1999; Tiska Decl. Ex. RR: Application for Continuing Grant dated Feb. 7, 2000; Tiska Decl. Ex. SS: Application for Continuing Grant dated Jan. 30, 2001.) NIMH instructions require that progress reports "[h]ighlight progress in implementation and developments or changes that have occurred" and "[n]ote any difficulties encountered by the program." (Tiska Decl. Ex. M: Additional Instruction for Preparing a Continuation Application for an Institutional National Research Award Grant ("Additional Instructions") at V–2.)

## DISCUSSION

### I. *Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Davis v. Blige*, 505 F.3d 90, 97 (2d Cir.2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505; *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir.2007)).

To impose liability under the False Claims Act generally, a relator must show that a defendant (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury. *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir.2001). To establish liability under subsection (a)(7), which covers "reverse false claims," the first four elements are identical, but the fifth element requires that Defendants sought to "conceal, avoid, or decrease an obligation to the United States." *United States v. Raymond & Whitcomb Co.*, 53 F.Supp.2d 436, 444–45 (S.D.N.Y.1999).

## II. *"False or Fraudulent"*

■ The FCA does not define the term "false or fraudulent." However, "the juxtaposition of the word 'false' with the word 'fraudulent,' plus the meanings of the words comprising the phrase 'false claim,' suggest an improper claim is aimed at extracting money the government otherwise would not have paid." *Mikes*, 274 F.3d at 696.

Feldman contends that Cornell and van Gorp made false statements in both the Grant Application and the Progress Reports. There are material issues of fact which preclude a grant of summary judgment to Cornell and van Gorp. They include, *inter alia*, (1) whether the curriculum described in the Grant Application was adequately covered—the Grant Application described specific didactic courses but Feldman contends certain subjects like the Neuropsychology of HIV–1 infection were not even discussed (Rel. Ex. G: Deposition of Dr. Elizabeth Ryan, Jan. 24, 2008 ("Ryan Dep.") at 227:13–229:9); (2) whether the allocation between research and clinical work was accurately described in the Grant Application and progress reports—Feldman offers testimony by former Fellows that clinical work occupied significantly more than 25% of their time (*See* Ryan Dep. at 246–47; Rel. Ex. E: Deposition of Kimberly Louis dated Sept. 9, 2008 at 40–42); (3) whether it is material that, contrary to the Grant Application, a majority of the patients seen by the Fellows in their clinical work were not HIV-positive; (4) whether the Grant Application accurately disclosed additional clinical resources—such as the Gay Men's Health Crisis which was never contacted by van Gorp; and (5) whether it is material that the Progress Reports did not mention programmatic changes such as loss of the Rabkin cohort, absence of formal coursework, or fewer-than-expected HIV-positive patients available for clinical work. (Tiska Decl. Ex. PP: Application for Continuing Grant dated Jan, 21, 1998; Tiska

Decl. Ex. QQ: Application for Continuing Grant dated Jan. 21, 1999; Tiska Decl. Ex. RR: Application for Continuing Grant dated Feb. 7, 2000; Tiska Decl. Ex. SS: Application for Continuing Grant dated Jan. 30, 2001 (collectively "Progress Reports").)

### III. *Materiality*

■ While the Second Circuit has declined to decide whether materiality is an element for a claim under the False Claims Act, *Mikes,* 274 F.3d at 697, other courts of appeals have concluded that it is a requirement.[1] *See, e.g., United States ex rel. v. Bourseau,* 531 F.3d 1159, 1170–71 (9th Cir.2008) (reviewing cases from the Fourth, Fifth, Sixth and Eighth Circuits that have found a materiality element under the False Claims Act); *United States ex rel. Conner v. Salina Regional Health Ctr., Inc.,* 543 F.3d 1211, 1219 n. 6 (10th Cir.2008) (adopting materiality element in Tenth Circuit for false certification claims). *But see United States ex rel. Cantekin v. Univ. of Pittsburgh,* 192 F.3d 402, 415 (3d Cir.1999) (questioning whether materiality is an element, but declining to resolve the issue).

Six of seven circuits finding a materiality element for a False Claims Act claim have adopted the "natural tendency" test. This test "focuses on the potential effect of the false statement when it is made rather than on the false statement's actual effect after it is discovered." *United States ex rel. Antidiscrimination Ctr. of Metro New York, Inc. v. Westchester Cty. N.Y.,* 668 F.Supp.2d. 548, 569, 2009 WL 455269, at *20 (S.D.N.Y. Feb.24, 2009). The Eighth Circuit stands alone in adopting the "outcome test" requiring a relator to show that the statement at issue had "the purpose

and effect of causing the United States to pay out money it is not obligated to pay." *Costner v. URS Consultants, Inc.,* 153 F.3d 667, 677 (8th Cir.1998). This Court adopts the "natural tendency" test. *See Antidiscrimination Ctr.,* 668 F.Supp.2d at 569.

There is no dispute that the fellowship program as implemented differed from the program described in the Grant Application. (*Compare* Grant Application at NIH 000344–352, *with* 56.1 Stmt. ¶ 97(a)-(k).) The question is whether those differences are material.

Defendants offer affidavits from three IRG members that they would not have scored the Grant Application any differently even if all of Feldman's allegations were true. (56.1 Stmt. ¶ 66; Tiska Decl. Ex. J: Declaration of Dr. Marlene Oscar Berman dated Jan. 5, 2009, at ¶ 16, 18–22; Tiska Decl. Ex K: Declaration of Dr. Robert A. Bornstein dated Dec. 30, 2008, at ¶¶ 14 20, 24, 25, 27, 29; Tiska Decl. Ex. W: Declaration of Dr. William Joseph Woods dated Jan. 8, 2009 at ¶¶ 3–4). Defendants also rely on another IRG member, who testified that the most important factor for him was van Gorp's record of accomplishment. (56.1 Stmt. ¶ 67; Tiska Dec'l. Ex. X: Declaration of Dr. Geoffrey T. Fong dated Jan. 8, 2009, at ¶¶ 6–7.)

Feldman counters that the Summary Statement itself demonstrates the materiality of the alleged false statements. Specifically, the Summary Statement questioned the "[o]veremphasis on [n]europsychology unrelated to HIV/AIDS" and noted that the new HIV/AIDS Fellows may get "too much clinical work and training in neuropsychology, compared to the desired research training in HIV/

---

1. Congress amended the False Claims Act, effective May 20, 2009, to explicitly include materiality as an element of a claim. While the amendment applies to conduct that oc-

curs on or after the date of enactment, Congress's decision to include materiality buttresses those decisions reading a materiality element into the statute's earlier iteration.

AIDS." (Summary Statement at NIH 000295.)

Additionally, the IRG Summary Statement specifically identifies other aspects of the Grant Application as strengths that Feldman has alleged were false—namely the 75/25 percentage split between research and clinical work (Summary Statement at NIH 000291), and the "diverse clinical population available for study." (Summary Statement at NIH 000288.) This clearly creates a disputed issue of material fact that the testimony of four of the twenty members of the IRG does not obviate.

## IV. *Scienter*

■ "The [False Claims] Act defines 'knowingly' as either: (1) possessing actual knowledge; (2) acting in deliberate ignorance of falsity; or (3) acting in reckless disregard of falsity." *Mikes,* 274 F.3d at 696 (citing 31 U.S.C. § 3729(b).) "[N]o proof of specific intent to defraud is required." 31 U.S.C. § 3729(b). Feldman has evinced circumstantial evidence of scienter.

While Feldman has adduced evidence that many of the differences between the program described in the Grant Application and the program in practice were not disclosed in the Progress Reports, Defendants contend that this cannot support a finding of scienter because van Gorp relied on his reasonable interpretation of the NIH reporting guidelines. But the question is not one of interpretation. The plain language of the instructions for completing the Progress Reports requires that the applicant "[n]ote any difficulties encountered by the program." (Additional Instructions, at V–2.) Whether any of the differences between the Grant Application and the program in practice were "difficulties" is a fact question.

Feldman asserts that van Gorp hired several Fellows who were not primarily interested in HIV/AIDS, despite the fact the Grant Application was focused on Neuropsychology of HIV/AIDS. Moreover, the Grant Application provided that Fellows would spend a majority of their clinical time with HIV-positive patients. Van Gorp posits that this goal could not be achieved because of the unanticipated success of HIV/AIDS drugs. Yet the Grant Application explicitly recognized the impact of these drugs on the population of HIV-positive individuals.

While the evidence supporting a finding of scienter is relatively tenuous, the question is closely tied to the ultimate factual issues. Indeed, the Court of Appeals has been "lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences," because such issues are "appropriate for resolution by the trier of fact." *In re DDAVP Direct Antitrust Litig.,* 585 F.3d 677, 693 (2d Cir.2009) (quoting *Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir. 1999)). Thus, this Court declines to supplant the ultimate trier of fact.

## V. *Damage to the Government*

■ The Second Circuit has declined to decide whether damage to the United States was a required element of the FCA, noting that there is a split of authority on the issue. *Mikes,* 274 F.3d at 695 (citing *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776 (4th Cir.1999)). The False Claims Act provides for recovery of both (a) two to three times the damages to the government and (b) a civil penalty for the false or fraudulent claims. 31 U.S.C. § 3729(a). This civil penalty provision allows courts to find a violation even in the absence of proof of damages to the United States. *Blusal Meats, Inc. v. United States,* 638 F.Supp. 824, 827 (S.D.N.Y.

1986); *Antidiscrimination Ctr.*, 668 F.Supp.2d at 568, 2009 WL 455269, at *19. Thus, the most reasonable interpretation of the statutory language is that damages to the United States are not a required element of an FCA claim. *See Antidiscrimination Center*, 668 F.Supp.2d at 568, 2009 WL 455269, at *19.

### VI. *Original Source*

■ In order for a court to have subject matter jurisdiction over an FCA claim, the claim must be brought by an "original source." 31 U.S.C. § 3730(e)(4)(B). An "original source" under the FCA is one who (1) "has direct and independent knowledge of the information on which the allegations are based," (2) "has voluntarily provided the information to the Government before filing an action under this section" and (3) has "directly or indirectly been a source to the entity that publicly disclosed the allegations on which the suit is based." 31 U.S.C. § 3730(e)(4)(B); *United States v. N.Y. Med. Coll.*, 252 F.3d 118, 120 (2d Cir.2001) (citations omitted); *see also United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1159 (2d Cir.1993) (discussing the Second Circuit's decision to include the third requirement).

"Although a relator need not possess all relevant information in order to have 'independent' knowledge, he or she must possess 'substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation.'" *United States ex rel. Smith v. Yale Univ.*, 415 F.Supp.2d 58, 72 (D.Conn. 2006) (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir.1991)). As a Fellow in the program, Feldman clearly has more than mere background information of the alleged fraud. Courts have found relators to satisfy the "direct and independent knowledge" requirement for acts that occurred after they left an institution "so long as the allegations flow from matters over which he had direct knowledge while employed." *See Stinson*, 944 F.2d at 1160 (permitting relator to satisfy direct and independent knowledge requirement even after leaving the institution "so long as the allegations flow from matters over which he had direct knowledge while employed."); *Smith*, 415 F.Supp.2d at 73 ("Assuming that conduct substantially similar to that of which Relator has direct knowledge continued after his departure, it would not be in the ultimate interest of Government recovery to limit an action solely to conduct that occurred during his employment.").

■ The public disclosure requirement was "designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator. Information gleaned in litigation and on file in the clerk's office falls in this category." *Kreindler*, 985 F.2d at 1158 (quoting *Stinson*, 944 F.2d at 1155–56). While Feldman previously filed complaints with the American Psychological Association and the New York State Department of Education (56.1 Stmt. at ¶ 129), they were subject to confidentiality rules. Thus, this is not a situation where the information was "publicly disclosed because it was available to anyone who wished to consult the court file." *Kreindler*, 985 F.2d at 1158 (emphasis added).

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied. The parties are directed to appear for a

conference on December 21, 2009 at 11:00 a.m.

SO ORDERED: