10-3297 (L)
Feldman v. van Gorp et ano.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: January 30, 2012          Decided: September 5, 2012)

Docket Nos. 10-3297( Lead) 11-975 (Con)

-------------------------------------

United States of America ex rel. Daniel Feldman,

Plaintiff-Appellee,

- v -

Wilfred van Gorp and Cornell University Medical College,

Defendants-Appellants.[*]

-------------------------------------

Before:    SACK, RAGGI, and CHIN, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (William H. Pauley III, Judge) denying the defendants' motion for judgment as a matter of law and their motion for a new trial following a jury verdict partially in favor of the plaintiff on his claims brought on behalf of the government pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq., and awarding principally $855,714 in

-------

[*] The clerk's office is respectfully directed to amend the official caption of this case as shown above.

treble actual damages.  We conclude that: 1) where the government has provided funds for a specified good or service only to have defendant substitute a non-conforming good or service, a court may, upon a proper finding of False Claims Act liability, calculate damages to be the full amount of the grant payments made by the government after the material false statements were made; 2) there was sufficient evidence from which a reasonable jury could determine that the false statements at issue were material to the government's funding decision; and 3) the district court did not abuse its discretion in excluding evidence of inaction on the part of the National Institutes of Health in response to the plaintiff's complaint regarding the fellowship program in which he had been enrolled.

Affirmed.

Appearances:                TRACEY A. TISKA, R. Brian Black, Eva L. Dietz, on the brief) Hogan Lovells US LLP, New York, New York, for Defendant-Appellant Cornell University.

Nina M. Beattie, Brune & Richard LLP, New York, New York, for Defendant-Appellant Wilfred van Gorp.

MICHAEL J. SALMANSON (Scott B. Goldshaw, on the brief) Salmanson Goldshaw, P.C., Philadelphia, Pennsylvania, for Plaintiff-Appellee.

Jean-David Barnea, Rebecca C. Martin, Sarah S. Normand, Assistant United States Attorneys, of counsel, for Preet Bharara, United States Attorney for the Southern District of New York, for Amicus Curiae, The United States of America.

SACK, Circuit Judge:

The defendants appeal from a judgment of the United States District Court for the Southern District of New York (William H. Pauley III, Judge) denying their motion for judgment as a matter of law and their motion for a new trial following a jury verdict partially in favor of the plaintiff on his claims regarding the misuse of a research training grant brought on behalf of the government pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq., and awarding principally $855,714 in treble actual damages. We conclude that: 1) where the government has provided funds for a specified good or service only to have defendant substitute a non-conforming good or service, a court may, upon a proper finding of False Claims Act liability, calculate damages to be the full amount of the grant payments made by the government after the material false statements were made; 2) there was sufficient evidence from which a reasonable jury could determine that the false statements at issue were material to the government's funding decision; and 3) the district court did not abuse its discretion in excluding evidence of inaction on the part of the National Institutes of Health in response to the plaintiff's complaint regarding the fellowship program in which he had been enrolled.

**BACKGROUND**

In 1997, appellants Cornell University Medical College ("Cornell") and Dr. Wilfred van Gorp, a professor of psychiatry at Cornell, applied for funding from the Ruth L. Kirschstein National Research Service Award Institutional Research Training Grant program, also known as the "T32" grant program, of the National Institutes of Health ("NIH"). The T32 program funds pre- and post-doctoral training programs in biomedical, behavioral, and clinical research. T32 grants are meant to "help ensure that a diverse and highly trained workforce is available to assume leadership roles related to the Nation's biomedical and behavioral research agenda." NIH Guide, "NIH National Research Service Award Institutional Research Training Grants," at 1 (May 16, 1997), United States ex rel. Feldman v. Van Gorp, No. 10-3297, Joint Appendix ("J.A.") 2437 (2d Cir. Jan. 26, 2012) ("NIH Guide"). Positions funded through T32 grants may not be used for study leading to clinically-oriented degrees, "except when those studies are a part of a formal combined research degree program, such as the M.D./Ph.D." Id. at 2, J.A. 2438. Instead, funded programs must train their fellows "with the primary objective of developing or extending their research skills and knowledge in preparation for a research career." Id.

Institutions applying for T32 grants undergo a two-tiered review process. It begins with a review of the proposal

4

by a twenty-member "Initial Research Group" ("IRG"), also called a "peer review committee." IRG members are independent experts in scientific fields related to that of the grant application under review; they are not NIH employees. Each member scores applications based on his or her view of its scientific or technical merit guided by specified criteria, including, among other factors: the program director's and faculty's training records, as determined by the success of former trainees; the objective, design, and direction of the program; the caliber of the faculty; the institutional training environment, including the commitment of the institution to training and the resources available to trainees; and the institution's proposed plans for recruiting and selecting high-quality trainees. The scores are then averaged to arrive at an IRG "priority score." Testimony of Dr. Robert Bornstein at 1190-91, July 21, 2010 ("Bornstein Testimony"), J.A. 1955. This score is included with the IRG members' written comments in a summary statement, which is transmitted to the NIH.

The "second tier" of review is performed by the advisory council of the appropriate constituent organization of the NIH, in this case the National Institute of Mental Health ("NIMH"). The advisory council ranks the applications by priority score, and establishes a "pay line" at the point in the list of applications where there is no more funding available; only the applications above the "pay line" are recommended to the

director of the funding institute as potential grant recipients. "The role of the advisory council is not to second-guess the scientific review of the IRG. Rather, [the council] reviews the applications to ensure that they further the goals and interests of the awarding institute. Thus, the IRG review and the resulting high-priority score are keys to NIH funding." Id. at 1190, J.A. 1955-56.

Once an application has placed above the "pay line," the advisory council makes recommendations based on the scientific merit of the proposal, as judged by the IRG, and the relevance of the proposal to the awarding institute's programs and priorities. Funding is typically approved by the NIH for one year, and recipient institutions are eligible for up to four years of additional funding.

In order to renew a T32 grant, the recipient institution (in this case Cornell) must submit an annual renewal application and a progress report detailing the status of its project. In contrast with initial grant applications, renewal applications are reviewed solely by the NIH on a noncompetitive basis. The NIH considers the progress made under the grant and the grant's budget. By regulation, the annual progress report must contain a "comparison of actual accomplishments with the goals and objectives established for the period," and must specify "[r]easons why established goals were not met," if indeed they were not. 45 C.F.R. § 74.51(d)(1)-(2).

6

Recipient institutions must also "immediately notify" NIH of "developments that have a significant impact" on the research program, including "problems, delays, or adverse conditions which materially impair the ability to meet the objectives of the award." Id. § 74.51(f). This notification must also include a "statement of the action taken or contemplated, and any assistance needed to resolve the situation." Id.; see also Draft OIG Compliance Program Guidance for Recipients of PHS Research Awards, 70 Fed. Reg. 71312-01, 71320 (Nov. 28, 2005) ("Prompt voluntary reporting will demonstrate the institution's good faith and willingness to work with governmental authorities to correct and remedy the problem. In addition, reporting such conduct may be considered a mitigating factor by the responsible law enforcement or regulatory office . . . .").

Cornell's initial grant application at issue here sought funding for a fellowship program entitled "Neuropsychology of HIV/AIDS Fellowship." Van Gorp Grant Application at 1, J.A. 2254 (April 24, 1997) ("Grant Application"). The application explained that the two-year fellowship would train as many as six post-doctoral fellows at a time in "child and adult clinical and research neuropsychology with a strong emphasis upon research training with HIV/AIDS." Id. at 2, J.A. 2255. The training program would, according to the application, build on the Cornell faculty's extensive research into the neuropsychology of

7

HIV/AIDS, which included projects examining distress levels in HIV-AIDS patients during the course of their illness, the relationship between the neuropsychology of HIV/AIDS and patients' abilities to function at work or in school, and the possibility of using neuropsychological testing to predict whether AIDS patients will suffer from dementia. The application further explained that van Gorp would serve as the program director, and that he had a "long history of successful research, training and mentoring of students in HIV[] related work." Id. at 40, J.A. 2295.

The 123-page grant application outlined the fellowship's curriculum in detail. Fellows would be required to take "several formal, core didactic courses," and a number of elective courses. Id. at 45, J.A. 2300. In the first year of the fellowship, fellows would enroll in five core courses, some of which "have been designed specifically for the HIV Neuropsychology Fellowship." Id., J.A. 2300. These core courses would be supplemented by a "large number of courses, lectures, neuroscience educational programs, as well as other seminars in a variety of sub-speciality areas." Id. The curriculum for the second year, which included four core courses, would allow fellows to "develop more independent research skills and devote more time to their HIV research." Id. The fellows' progress under the grant would be monitored monthly by a formal training committee comprised of several faculty members, as "[o]ngoing

8

evaluation of the curriculum, trainees and faculty is an integral part of the training program."  Id. at 48, J.A. 2303.

The Cornell grant application identified a list of fourteen faculty members who would serve as "Key Personnel," which the NIH defined as "individuals who contribute to the scientific development or execution of the project in a substantive way."  NIH Grant Application Instructions at 26, J.A. 2612 (June 8, 1999).  The application described in detail some of these research projects.  It also asserted, "Our faculty has a solid track record in quality and productive research in brain-behavior issues, including research in HIV/AIDS-related research [sic]."  Grant Application at 48, J.A. 2303.  And the application identified additional institutions which would serve as clinical resources, including Cornell University, Memorial Sloan-Kettering Cancer Center, St. Vincent's Hospital, and Gay Men's Health Crisis Center.

In describing the fellowship program's commitment to research training, the grant application explained that "the majority of [the fellows'] clinical work will be with persons with HIV infection."  Grant Application at 44, J.A. 2299.  Fellows would "devote an average of 75% of their time to research and an average of 25% [of their] time to clinical work with persons with HIV/AIDS and other neuropsychiatric disorders."  Id.

The IRG gave Cornell's grant application a high priority score, and the NIH subsequently approved funding for two

9

fellows for the fiscal year beginning September 30, 1997, with the possibility of additional funding for up to four additional years. Cornell submitted renewal applications in each of the following four years, from fiscal year 1999 (July 1, 1998, through June 30, 1999) to fiscal year 2002 (July 1, 2001, through June 30, 2002), all of which the NIH approved. In the accompanying annual progress reports, Cornell and van Gorp indicated that there had been no material alterations to the program as described in the original grant application.

In the renewal application for the second renewal year (the third year overall), for example, Cornell and van Gorp wrote that "[a]ll core and supporting faculty listed in our original application are continuing. . . . There have been no alterations in the courses or training program from that listed in the original application, except for the addition of two [specified] courses . . . ." 1999 Progress Report at 7, J.A. 2402 (January 19, 1999). The renewal application also explained that the program had been relocated from Cornell's White Plains campus to its New York City (Manhattan) campus in order to provide fellows with "immediate access to subjects and patients who have HIV/AIDS." Id. The renewal applications for the fourth and fifth year stated that "[t]he core structure of our training program has remained the same as in years past and to that described in our initial application." 2000 Progress Report at 4, J.A. 2411 (January 24, 2000); 2001 Progress Report at 5, J.A.

10

2422 (January 22, 2001). The NIH approved each of these renewal applications.

In September 1998, at about the time the first renewal-year began, Daniel Feldman, the plaintiff,[1] was selected by Cornell to participate in the fellowship program. He left the program in December 1999, before the completion of his two-year fellowship. Other fellows who participated in the program included Elizabeth Ryan, Clifford Smith, Kimberly Walton Louis, and Evan Drake. At trial, Feldman presented evidence that the actual fellowship deviated in many ways from that described in the Grant Application, and that Cornell and van Gorp failed to inform NIH of these deviations.

Testimony presented at trial indicated that some of the faculty members identified as "Key Personnel" in the initial application did not in fact contribute in any substantive way to the fellowship program. Van Gorp acknowledged that the contributions to the program of two of these faculty members, Dr. Tatsuyki Kakuma and Dr. Michael Giordano, were considerably limited, if not entirely eliminated, by the fact that the two doctors were not in physical proximity to the fellows during the grant period. Many fellows, according to their testimony, had little or no interaction with the remaining key personnel, and

---

[1] Because this suit is being brought by Feldman on behalf of the United States, Feldman is technically the "plaintiff-relator." See infra, note **[3].** We nonetheless refer to him simply as the "plaintiff."

11

were unaware that these faculty members were or were supposed to be available as resources.  In addition, according to this testimony, fellows were largely unaware of research opportunities at medical centers other than Cornell.

There was also testimony in the district court to the effect that Cornell and van Gorp failed to notify NIH that the curriculum outlined in the initial grant application was never implemented.  Several core courses identified in the application were not regularly conducted for fellows, and fellows were not informed that these courses were a required component of the program.  Moreover, according to this testimony, fellows were never evaluated or supervised by the training committee referred to in the Grant Application.

Feldman also presented evidence that the research and clinical training described in the initial grant application differed significantly from the actual training received.  NIH rules provide that fellows in a T32 program "must devote their time to the proposed research training and must confine clinical duties to those that are an integral part of the research training experience."  NIH Guide at 3, J.A. 2439; T32 Training Grant Announcement at 9, J.A. 2568 (June 16, 2006).  And, in accordance with these requirements, the grant application stated that "the majority of [the fellows'] clinical work will be with persons with HIV infection."  Grant Application at 44, J.A. 2299. Further, in explaining the training program's relocation from

12

White Plains to Manhattan, the third-year renewal application explained that "[f]ellows [would be] housed within a large, medical/surgical setting with immediate access to subjects and patients who have HIV/AIDS."  1999 Progress Report at 7, J.A. 2402.

But, as the plaintiff summarizes the trial testimony, out of the 165 clinical cases that the fellows saw during their fellowship, only three involved HIV-positive patients.[2]  Pl.'s Br. at 22.  Several fellows testified that much of the research that they performed under the grant program had no relation to HIV or AIDS at all.  For example, Clifford Smith testified that the research projects he worked on under the T32 grant were primarily related to epilepsy and aging, and did not involve an HIV population.  Out of the eight research projects that Evan Drake worked on during his fellowship, he said, only one focused specifically on HIV.  Feldman similarly told the court that he worked on only one HIV-focused project during his time as a fellow.

In July 2001, after he had left the program, Feldman submitted a letter to the NIH complaining about the program's focus on clinical work rather than research, and the fellows'

---

[2]  The parties stipulated that of Ryan's 32 clinical patients, two were HIV positive; of Smith's 35 clinical patients, none were HIV positive; of Louis's 23 patients, none were HIV positive; of Drake's 48 patients, none were HIV positive; and of Feldman's 27 patients, one was HIV positive.

13

limited access to HIV-positive patients.  In March 2002, he submitted another letter to the NIH, again complaining that the fellowship program deviated from its description in the initial grant application.  In response, the NIH asked Cornell to conduct an investigation of the complaint, which Cornell completed in June 2003.  Cornell then sent Feldman a letter informing him that the investigation uncovered no wrongdoing.

On October 14, 2003, Feldman filed a _qui tam_ complaint pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 _et seq._,[3] alleging that Cornell and van Gorp made false claims to

---

[3]

> In a _qui tam_ action, a private plaintiff, known as a relator, brings suit on behalf of the Government to recover a remedy for a harm done to the Government.  See United States ex rel. Eisenstein v. City of New York, [556 U.S. 928, 932] (2009) (describing _qui tam_ actions under the False Claims Act, 31 U.S.C. § 3729 _et seq._); see also Black's Law Dictionary 1282 (8th ed. 2004) (defining "_qui tam_ action" as "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive").  _Qui tam_ plaintiffs, even if not personally injured by a defendant's conduct, possess constitutional standing to assert claims on behalf of the Government as its effective assignees.  There is, however, no common law right to bring a _qui tam_ action; rather, a particular statute must authorize a private party to do so.

Woods v. Empire Health Choice, Inc., 574 F.3d 92, 97-98 (2d Cir. 2009) (footnote and some citations omitted; second brackets in original).

Where the United States has elected not to proceed with the action, as here, the relator is entitled personally to recover

14

the United States in the Grant Application and in the four renewal applications. Feldman alleged that statements made in these applications were false because the fellowship's curriculum, resources, faculty members, and training differed significantly from that described in the application, and in the subsequent renewal applications representing that no changes had been made to the program. The complaint was unsealed in April 2007, after the United States declined to intervene in this action. See Cook County v. United States ex rel. Chandler, 538 U.S. 119, 122 (2003) ("The relator must inform the Department of Justice of her intentions and keep the pleadings under seal for 60 days while the Government decides whether to intervene and do its own litigating." (citing 31 U.S.C. § 3730(b)(2)-(c))).

On January 9, 2009, after discovery had been completed, Cornell and van Gorp moved for summary judgment. On December 7, 2009, the district court denied the motion, concluding that there were genuine issues of material fact as to whether the defendants made false statements in both the initial grant application and the renewal applications, and whether those statements were material to the funding decisions. United States ex rel. Feldman v. Van Gorp ("Feldman I"), 674 F. Supp. 2d 475, 482-83 (S.D.N.Y. 2009). The district court also concluded that the plaintiff need

---

between 25 and 30 percent of the proceeds of the action or settlement, plus reasonable attorney's fees. See 31 U.S.C. § 3730(d)(2).

15

not establish actual damages to the government as an element of an FCA claim because that statute's provision of civil penalties for false and fraudulent claims allowed courts to "find a violation even in the absence of proof of damages to the United States." Id. at 481. The court did not address, however, whether Feldman's recovery would be limited to statutory damages.

On December 18, 2009, the defendants moved for reconsideration of the summary judgment decision, arguing that the district court had erred in failing to address the issue of whether Feldman should be limited to statutory penalties because he had not presented sufficient evidence of actual damages to the United States. On May 3, 2010, the district court denied the motion, explaining that although the damages to the United States could not be calculated in the same way they would be in a standard breach-of-contract action because no tangible benefit had been received, the plaintiff would not be limited to statutory damages. United States ex rel. Feldman v. Van Gorp ("Feldman II"), No. 03 Civ. 8135, 2010 WL 1948592, at *1-*2, 2010 U.S. Dist. LEXIS 47039, at *4-*6 (S.D.N.Y. May 3, 2010). The court said that the "'benefit of the bargain' to the government is providing funds to recipients who best fit its specified criteria and that this benefit is lost when funds are diverted to less eligible recipients." Id. at *2, 2010 U.S. Dist. LEXIS 47039, at *4-*5. Therefore, "if the fact-finder concludes that the government would not have awarded the grant absent the false

16

claims, it may properly conclude that the measure of damages is the total amount the government paid." Id., 2010 U.S. Dist. LEXIS 47039, at *6.

Before trial, Feldman submitted a motion in limine to exclude evidence including that of NIH's inaction towards Cornell and van Gorp in response to Feldman's complaints about the fellowship program. On July 8, 2010, the district court granted Feldman's motion to exclude that evidence. The court concluded that the evidence of NIH's inaction was irrelevant and therefore inadmissible under Rule 402 because "no discovery was conducted concerning the standards [NIH used] to determine the existence of misconduct and whether those standards are at all similar to the elements of an FCA claim." United States ex rel. Feldman v. van Gorp ("Feldman III"), No. 03 Civ. 8135, 2010 WL 2911606, at *3, 2010 U.S. Dist. LEXIS 73633, at *7 (S.D.N.Y. July 8, 2010). Moreover, the court concluded, even if "marginally relevant," the evidence would have been excluded pursuant to Rule 403 because of the possibility that it would confuse or mislead the jury.[4] Id.

The case was tried to a jury for eight days in July 2010, resulting in a partial verdict for Feldman. The jury found the defendants not liable for false statements in the Grant

---

[4] The district court similarly excluded evidence of inaction on the part of the New York State Department of Education and the American Psychological Association, but the defendants do not challenge the exclusion of that evidence on appeal.

17

Application and the first renewal application, but found liability based on the renewal applications for the third, fourth and fifth years of the grant, i.e., the second, third and fourth renewal years. On August 3, 2010, the district court awarded actual damages in treble the amount NIH paid for the last three renewal years of the grant -- the trebling being provided for in the FCA, 31 U.S.C. § 3729(a)(1) -- totaling $855,714. The judgment also included statutory penalties of $32,000, for a total of $887,714. The district court also awarded to the plaintiff $602,898.63 in attorney's fees, $25,862.15 in costs, and $3,121.47 in expenses.

On August 25, 2010, the defendants filed a motion for judgment as a matter of law under Rule 50(b), or in the alternative, for a new trial pursuant to Rule 59. The defendants argued that there was insufficient evidence from which the jury could properly have concluded that the false statements at issue were material to the NIH's decisions to renew the T32 grant, and that the court should grant judgment as a matter of law, or that such a conclusion was against the weight of the evidence and warranted a new trial. The defendants also argued that the district court erred in determining as a matter of law that damages were equal to the entire grant amounts for the years in which liability was found rather than submitting that question to the jury.

18

The district court denied this motion on December 9, 2010. United States ex rel. Feldman v. van Gorp ("Feldman IV"), No. 03 Civ. 8135, 2010 WL 5094402, at *5, 2010 U.S. Dist. LEXIS 130358, at *14-*15 (S.D.N.Y. Dec. 9, 2010). The court concluded that Feldman had presented sufficient evidence for the jury to conclude that the false statements were material to the NIH's funding decisions, noting that NIH's guidelines and instructions on the renewal applications unambiguously stated that it should be notified of any changes made to the grant program. Id. at *2-*5, 2010 U.S. Dist. LEXIS 130358, at *4-*14. The district court also relied on its opinion in Feldman III to deny the motion for a jury trial on damages. Id. at *5, 2010 U.S. Dist. LEXIS 130358, at *13-*15.

The defendants appeal.

**DISCUSSION**

The defendants contend that: (1) the district court erred in its methodology for determining damages and in determining the amount of those damages, as a matter of law; (2) the jury did not have sufficient evidence from which to conclude that the false statements at issue were material to the funding decision; and (3) the district court erred in excluding evidence of NIH's "inaction" in response to Feldman's complaint.

I. Damages

The False Claims Act prohibits a person from "knowingly present[ing], or caus[ing] to be presented, [to an officer or

19

employee of the United States Government,] a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A). Liability under the Act also requires a showing of materiality.[5] Under the Act as currently in force, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Id. § 3729(b)(4); see also Neder v. United States, 527 U.S. 1, 16 (1999) ("In general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." (brackets in original; internal quotation marks omitted) (criminal fraud case)).

The FCA provides for damages equal to "3 times the amount of damages which the Government sustains because of the act of that person," in addition to a "civil penalty."  31 U.S.C. § 3729(a)(1).  The Act does not specify how damages are to be calculated, but the Supreme Court has recognized that the purpose of damages, even as multiplied, under the Act is to make the

---

[5]  In 2009, Congress amended the False Claims Act to add a specific requirement that to be actionable a false statement must be material.  31 U.S.C. § 3729(a)(1)(B).  It purports to apply prospectively and therefore would not apply to this case.  See Feldman I, 674 F. Supp. 2d at 480.  Never prior to that enactment and absent its materiality provision did we explicitly require a showing of materiality in FCA cases, although six of the seven circuits to address the issue did.  See id. (citing decisions). We need not decide here whether a showing of materiality was required because, assuming that it was, the requirement has been met, as we explain in Part II, below.

20

government "completely whole" for money taken from it by fraud. United States ex. rel. Marcus v. Hess, 317 U.S. 537, 551-52 (1943), superseded by statute as recognized by United States ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94 (2d Cir. 2010) ("We think the chief purpose of the statutes here [predecessors of the current False Claims Act, providing for double rather than treble damages] was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole."). Because the district court here determined that damages could be established as a matter of law, we review that conclusion de novo. See Bessemer Trust Co., N.A. v. Branin, 618 F.3d 76, 85 (2d Cir. 2010) (stating that where the district court has determined damages, we review its application of legal principles de novo and its factual findings for clear error).

The question of how damages should be measured in an FCA case where "contracts entered into between the government and the Defendants did not produce a tangible benefit to the [government]," United States ex. rel. Longhi v. United States, 575 F.3d 458, 473 (5th Cir. 2009), is one of first impression in this Court. The defendants argue both that the district court erred in concluding that application of the standard benefit-of-the-bargain calculation as a methodology for determining damages was inappropriate in this case, and that it erred in deciding the

21

amount of damages as a matter of law based on the jury's verdict, rather than allowing the jury to assess the amount of damages due.

A.  Proper Measure of Damages

In most FCA cases, damages are measured as they would be in a run-of-the-mine breach-of-contract case -- using a "benefit-of-the-bargain" calculation in which a determination is made of the difference between the value that the government received and the amount that it paid.  See United States v. Foster Wheeler Corp., 447 F.2d 100, 102 (2d Cir. 1971) (collecting cases); cf. Terwilliger v. Terwilliger, 206 F.3d 240, 248 (2d Cir. 2000) ("[S]o far as possible, [New York contract] law attempts to secure to the injured party the benefit of his bargain, subject to the limitations that the injury -- whether it be losses suffered or gains prevented -- was foreseeable, and that the amount of damages claimed be measurable with a reasonable degree of certainty and, of course, adequately proven." (internal quotation marks omitted)).  This method of calculation is employed, for example, when the government has paid for goods or services that return a tangible benefit to the government.

There are generally two ways of determining damages in such cases.  First, if the non-conforming goods or services have an ascertainable market value, then damages are measured according to the "'difference between the market value of the

22

product [the government] received and retained and the market value that the product would have had if it had been of the specified quality.'" United States v. Science Application Int'l Corp., 626 F.3d 1257, 1279 (D.C. Cir. 2010) (quoting United States v. Bornstein, 423 U.S. 303, 316 n.13 (1976)) (alterations omitted). If the non-conforming goods' or services' market value is not ascertainable, then the fact-finder determines the amount of damages by calculating the difference between "the amount the government actually paid minus the value of the goods or services the government received or used," as judged by the fact-finder. Id.

The defendants contend that a "benefit-of-the-bargain" calculation was appropriate in this case, and that the district court erred by awarding the government the full amount of the grant for the years for which the violations were found rather than the difference between the value of the training promised and that actually delivered. The plaintiff argues, to the contrary, that a different measure of damages is appropriate in cases such as this, where "the defendant fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself" and the government received nothing of tangible value from the defendant. Id.; see also Longhi, 575 F.3d at 473 ("[W]here there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in

23

the amount the government actually paid to the Defendants."). This approach rests on the notion that the government receives nothing of measurable value when the third-party to whom the benefits of a governmental grant flow uses the grant for activities other than those for which funding was approved. In other words, when a third-party successfully uses a false claim regarding how a grant will be used in order to obtain the grant, the government has entirely lost its opportunity to award the grant money to a recipient who would have used the money as the government intended.

The plaintiff and the United States, as amicus curiae, argue that this is such a case: The government received no tangible benefit from the T32 grant -- students and others may have, but not the government. The grant represented an attempt to, but did not thereby, promote "child and adult clinical and research neuropsychology with a strong emphasis upon research training with HIV/AIDS." Grant Application at 2, J.A. 2255. The plaintiff argues that the government is therefore entitled to damages equal to the full amount of grants awarded to the defendants based on their false statements.

We conclude that the measure of damages advocated by the plaintiff and the United States is correct.

Although we have not addressed this question, several of our sister circuits have done so in decisions that support the conclusion we now reach. See Science Application, 626 F.3d at

24

1279 (D.C. Cir.); Longhi, 575 F.3d at 473 (5th Cir.); United States v. Rogan, 517 F.3d 449, 453 (7th Cir. 2008) ("The government offers a subsidy . . . with conditions. When the conditions are not satisfied, nothing is due."); United States v. Mackby, 339 F.3d 1013, 1018-19 (9th Cir. 2003) ("Had Mackby been truthful, the government would have known that he was entitled to nothing . . . .").[6]

The defendants point out, however, that other courts have applied the "benefit-of-the-bargain" calculation in cases they assert are similar to this one. They argue that because "[t]he ultimate beneficiary of all government grants or contracts is the public regardless of who receives the 'direct' benefit," the flow of benefits to a third-party should not be determinative of the damages measure. Defs.' Reply Br. at 5.

---

[6] District courts within this Circuit have also employed this methodology. See United States v. Karron, 750 F. Supp. 2d 480, 493 (S.D.N.Y. 2011), appeal filed, No. 11-1924 (concluding that the defendant was liable for the full amount of a government-funded research grant because he "cannot establish that the Government received any ascertainable benefit from its relationship with CASI. Even assuming that CASI in fact met various milestones and provided reports to the Government, such actions yielded no tangible benefit to the Government."); United States ex rel. Antidiscrimination Ctr. of Metro N.Y., Inc. v. Westchester County, No. 06 Civ. 2860, 2009 WL 1108517, at *3, 2009 U.S. Dist. LEXIS 35041, at *9 (S.D.N.Y. Apr. 24, 2009) ("Westchester has identified no tangible asset or structure it provided to the United States such that this theory would be applicable; it did not have a contract with the government to build any sort of facility for the government's use or to provide it with goods.").

In support of this theory, the defendants cite <u>United States v. Hibbs</u>, 568 F.2d 347 (3d Cir. 1977).  There, the Third Circuit applied a benefit-of-the-bargain calculation in an FCA case involving the defendants' fraudulent statements to the Federal Housing Administration regarding the condition of various residential properties.  Relying on these representations, the agency insured mortgages on several properties, and the agency was required to pay these mortgages when the purchasers defaulted.  <u>Id.</u> at 349.

The government argued that its damages were the total amount of the mortgage debt it had assumed, insisting that "had [the defendant] not furnished the false certification, it would not have insured the mortgage[s] and therefore would not have been called upon to make any payment."  <u>Id.</u> at 351.

The Third Circuit rejected this argument.

> The government's actual damage was the decrease in worth of the security that was certified as being available, measured by the difference in value between the houses as falsely represented, and as they actually were.  Since the government was given security which was less than what it was represented to be, the damages are essentially similar to those sustained when a defective article is purchased in a fraudulent transaction.  In those instances, decisional law sets the damages as the difference in cost between that contracted for and that received.

<u>Id.</u>

Similarly, in Coleman v. Hernandez, 490 F. Supp. 2d 278 (D. Conn. 2007), a case involving the so-called "Housing Choice Voucher Program" or "Section 8," under which the government provides housing subsidies to qualifying individuals, the district court declined to award the plaintiff the full amount that the government paid to subsidize her rent, even though her landlord had allegedly made false statements to the government by overcharging the plaintiff for rent. Id. at 280-83. The Coleman court acknowledged that in other FCA cases, courts had awarded damages equal to the full amount of the government's payment. Id. at 281-82. But the court decided that in the case before it, the awardable damages were equal to the difference between the market rent, and the amount that the landlord charged the government including the additional, improper payments it had received, i.e., the amount of the overcharge. Id. at 282. The government was then made whole, receiving the full benefit of its bargain -- trebled by statute.

The defendants also look to Medicaid and Medicare FCA cases for support. They contend that adopting the plaintiff's theory of damages, all such cases would result in damages equal to the full amount the government paid in reimbursements to physicians because "the direct benefit always goes to patients." Defs.' Reply Br. at 5.

This is not, however, the methodology generally employed by courts evaluating FCA claims based on Medicaid or

27

Medicare fraud. In <u>United States ex. rel. Tyson v. Amerigroup Illinois, Inc.</u>, 488 F. Supp. 2d 719 (N.D. Ill. 2007), the court awarded damages based on the difference between the amount of Medicare payments that the defendant should have received, and the amount that it had actually charged the government. <u>Id.</u> at 739. Similarly, in <u>United States ex. rel. Doe v. DeGregorio</u>, 510 F. Supp. 2d 877 (M.D. Fla. 2007), the court also held that damages were the "the amount of money the government paid out by reason of the false claims over and above what it would have paid out if the claims had not been false." <u>Id.</u> at 890.

In short, in each of the cases cited by the defendants, the government paid for a contracted service with a tangible benefit -- whether it be medical care, security on mortgages, or subsidized housing -- but paid too much. The government in these cases got what it bargained for, but it did not get <u>all</u> that it bargained for. Thus, courts treated the difference between what the government bargained for and what it actually received as the measure of damages. Here, by contrast, the government bargained for something qualitatively, but not quantifiably, different from what it received.

This approach comports with the one we discussed in making a sentencing calculation of loss in <u>United States v. Canova</u>, 412 F.3d 331, 352 (2005) (rejecting argument that abbreviated medical tests performed by the defendant were as clinically sound as full tests required by Medicare so that the

28

government sustained no loss).  There, we explained that it was not a court's task to second-guess a victim's judgment as to the necessity of specifications demanded and paid for.  See id. ("Whether the testing time on a pacemaker, the number of rivets on an airplane wing, or the coats of paint on a refurbished building is a matter of necessity or whim, the fact remains that the victim has been induced to pay for something that it wanted and was promised but did not get, thereby incurring some measure of pecuniary 'loss.'")  To be sure, Canova recognized that "a victim's loss in a substitute goods or services case" does not "necessarily equal[] the full contract price paid."  Id. at 353. But this was not because a defendant had the right to an offset for the value of the substituted good or service.  Rather, the proper focus of any loss calculation was on "the 'reasonably foreseeable costs of making substitute transactions and handling or disposing of the product delivered or retrofitting the product so that it can be used for its intended purpose,' plus the 'reasonably foreseeable cost of rectifying the actual or potential disruption to [the victim's] operations caused by the product substitution."  Id. (quoting U.S.S.G. § 2f1.1, cmt n.8(c)).  Canova emphasized that a court calculating loss cannot simply "rewrit[e] the parties' contract to excise specifications paid for but not received and, thereby, conclud[e] that the victim sustained no [or a reduced] loss."  Id.

29

Canova's reasoning supports the challenged loss calculation. As a result of the fraudulent renewals, the government was paying for a program that was not at all as specified. By contrast to the Medicare cases cited by defendants, the government did not receive less than it bargained for; it did not get the "neuropsychology with a strong emphasis upon research training with HIV/AIDS" program it bargained for at all. Further, nothing in the record indicates that it could now secure such a program at any lesser cost. We therefore conclude that the appropriate measure of damages in this case is the full amount the government paid based on materially false statements.

B. Fraudulent Inducement

The defendants acknowledge that courts have applied the plaintiff's theory of damages in cases including Mackby, Rogan, and Longhi, but argue that those cases are distinguishable from this one because the defendants in each of those cases obtained funds through fraudulent inducement -- and that any such theory would fail here because no liability was found with respect to the Grant Application. "In a fraudulent inducement case, [it is] the false statements [that] allow the defendant to obtain the funding in the first place." Defs.' Reply Br. at 9.

According to the defendants, because a defendant in a fraudulent inducement case would not be eligible for any funding received after the initial false claim, a court in such a case could properly conclude that the defendant is liable for the

30

entire amount that the government paid. But "[h]ere, the jury expressly found that the initial Application contained no false statements, and there was no false certification ever at issue." Id. The defendants argue that Mackby, Rogan, and Longhi therefore do not support the damages theory employed by the district court.

We see no principled distinction, however, between fraudulently inducing payment initially, thereby requiring all payments produced from that initial fraud to be returned to the government (trebled and with certain fees and costs added as provided by statute), and requiring payments based on false statements to be returned to the government when those false statements were made after an initial contractual relationship based on truthful statements had been established. Although it may be true that under a fraudulent inducement theory, "subsequent claims for payment made under the contract [that] were not literally false, [because] they derived from the original fraudulent misrepresentation, [are also] . . . actionable false claims," Longhi, 575 F.3d at 468 (second brackets in original; internal quotation marks omitted), this proposition simply speaks to the time period for which FCA liability may be found. It does not suggest that without fraudulent inducement, no subsequent false statements can result in FCA liability.

31

If the government made payment based on a false statement, then that is enough for liability in an FCA case, regardless of whether that false statement comes at the beginning of a contractual relationship or later.  The only difference would be that liability begins when the false statement is made and relied upon, rather than at the beginning of the contractual relationship, as it would be in a fraudulent inducement case.  Here, the jury found that materially false statements had been made by the defendants in years 3, 4, and 5 of the grant, and the court properly awarded damages based on that finding.

C.   Damages as a Matter of Law

The defendants argue that the calculation of damages should have been decided as a question of fact by a jury, not as a matter of law by the district court.  Indeed, in FCA cases, the jury ordinarily does determine the amount of damages to be imposed upon the defendant.  See Chandler, 538 U.S. at 132.  We conclude, however, that here, where the question is not the benefit of the bargain between the plaintiff and the defendants, and the amount of each payment for which liability has been assessed is not in dispute, no further finding of fact as to the amount of the damages was necessary.

As the government correctly observes in its amicus brief, awarding damages in this manner is not novel.  And often, the amount of damages in such cases has been determined as a matter of law in the course of the court's grant of summary

32

judgment to the plaintiff.  See, e.g., Longhi, 575 F.3d at 461 (affirming summary judgment and damages award); United States v. TDC Mgmt. Corp., 288 F.3d 421, 428 (D.C. Cir. 2002) (agreeing that the district court could properly decide the damages award where the government received no benefit from the transaction).

United States ex rel. Antidiscrimination Center of Metro New York, Inc. v. Westchester County, No. 06 Civ. 2860, 2009 WL 1108517, 2009 U.S. Dist. LEXIS 35041 (S.D.N.Y. Apr. 24, 2009), is illustrative.  There the federal government paid approximately $52 million as part of a federal grant to Westchester County for the purposes of housing and community development.  Id. at *2-*4, 2009 U.S. Dist. LEXIS 35041, at *5-*11.  The grant required the county to certify that it would "conduct an analysis of impediments . . . to fair housing choice, including those impediments imposed by racial discrimination and segregation, to take appropriate actions to overcome the effects of any identified impediments, and to maintain records reflecting the analysis and actions."  Id. at *1, 2009 U.S. Dist. LEXIS 35041, at *2-*3.  The court granted summary judgment for the plaintiff after finding that Westchester County had not conducted the analysis as promised.  The court agreed with the plaintiff's contention that damages should be the full amount the government paid, and rejected the county's argument that the damages question should be submitted to the jury.  There, as here, "the United States did not get what it paid for," and there was no

33

role for the jury because "Westchester's damages cannot be reduced by reference to the alleged 'benefit' it provided to HUD." Id. at *3, 2009 U.S. Dist. LEXIS 35041, at *9.

We conclude that in the case before us, inasmuch as the damages equal the full amount that the government paid and that amount is not in dispute, they were properly determined by the district court as a matter of law.

D. Sufficiency of the Evidence

Finally, the defendants contend that the plaintiff did not submit sufficient evidence to the jury to establish by a preponderance of the evidence that the government suffered damages equal to the full amount of the T32 grant. The defendants argue that "to prove that the amount of damages was the entire amount of the grant, a relator would be required to prove that the government received no value -- at all -- through the grant work it funded." Defs.' Br. at 37.

The defendants support this contention by citing benefit-of-the-bargain cases. The defendants' argument is therefore unavailing. Unlike a benefit-of-the-bargain case, no specific amount of damages must be proved because, as we have explained at length, damages in this case equal the entire amount of the grant that was lost as a result of the fraud.

II. Materiality

The defendants assert that the false statements to the government that are at issue were not material to the

34

transactions in question.  The district court therefore erred, they say, in denying the defendants' motion for judgment as a matter of law and for a new trial.[7]

We conclude that the jury had sufficient evidence from which to conclude, as it did, that the defendants' false statements materially influenced NIH's decisions to renew the T32 grant.

A motion for a new trial will ordinarily be granted "so long as the district court determines that, in its independent judgment, the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice."  Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks omitted).  We review the district court's denial of a motion for a new trial for abuse of discretion.  Id.

A motion for judgment as a matter of law may be granted only "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  "A court evaluating such a motion cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury."  Black v. Finantra Capital, Inc., 418 F.3d

---

[7] For the reasons referred to in note **[5]**, supra, we assume that materiality is required by the pre-2009 version of the FCA, although we need not decide that issue on this appeal.

35

203, 209 (2d Cir. 2005) (internal quotation marks omitted). Because such a judgment is made as a matter of law, we review it de novo. We must "consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." Id. at 208-09 (internal quotation marks omitted).

The district court concluded that the plaintiff had "presented significant documentary evidence to support a finding of materiality." Feldman IV, 2010 WL 5094402, at *2, 2010 U.S. Dist. LEXIS 130358, at *5.

First, the parties stipulated that in order for a grantee to receive additional funding after the initial grant year, the "grantee must submit a noncompetitive renewal application . . . includ[ing] a progress report which NIH expects will provide information about the trainees['] activities during the previous funding period." Id. Second, the renewal instructions for the T32 grant contain a statement explaining that "'Progress Reports provide information to awarding component staff that is essential in the assessment of changes in scope or research objectives . . . from those actually funded. They are also an important information source for the awarding component staff in preparing annual reports, in planning programs, and in communicating scientific accomplishments to the public and to Congress.'" Id., 2010 U.S. Dist. LEXIS 130358, at *6 (quoting

36

NIH Grant Continuation Instructions at 7, J.A. 2462). Third, the renewal instructions direct grantees to "highlight progress in implementation and developments or changes that have occurred. Note any difficulties encountered by the program. Describe changes in the program for the next budget period, including changes in training faculty and significant changes in available space and/or facilities." Id. (internal quotation marks and brackets omitted). The instructions also ask for "'information describing which, if any, faculty and/or mentors have left the program.'" Id. at *3, 2010 U.S. Dist. LEXIS 130358, at *6-*7 (quoting T32 Program Announcement PA-06-648 at 22, J.A. 2581 (June 16, 2006)).

The district court rejected the defendants' argument that the jury was required to accept Dr. Robert Bornstein's unrebutted testimony on the issue of materiality. Id., 2010 U.S. Dist. LEXIS 130358, at *7. Bornstein was a member of the IRG that reviewed the defendants' initial grant application. At trial, he testified as to the factors he considered material to his analysis of a grant application. He asserted that although he reviewed the application, he did not expect that every faculty member identified in the initial grant application would be involved with the fellowship program. He also testified that he did not expect the fellowship program to follow the exact curriculum outlined in the initial application. The defendants

37

argued that this testimony established that not all false statements in the renewal applications were material.

The district court rejected this argument because Bornstein never reviewed the renewal applications, nor did he have an independent recollection of reviewing the initial grant application. Id., 2010 U.S. Dist. LEXIS 130358, at *7-*8. The court also concluded that "[t]he absence of testimony by a government official supporting a finding of materiality does not mean that the jury was required to accept Bornstein's testimony." Id., 2010 U.S. Dist. LEXIS 130358, at *7. "[T]he jury was well within its bounds to credit NIH's unambiguous guidelines and instructions over Bornstein's conclusory testimony that little in the Grant Application really would have mattered to him had he remembered reviewing it at all." Id., 2010 U.S. Dist. LEXIS 130358, at *8.

On appeal, the defendants do not dispute that the renewal applications contained NIH's instructions and guidelines. They contend instead that "none of these statements, taken individually or together, establish what information was material to NIH's funding decisions on renewals," Defs.' Br. at 47, "the Renewal Instructions and the Program Announcement are silent as to what information matters to NIH for purposes of its funding decision." Id. at 52. The defendants argue in substance that there is no evidence from which the jury could have decided that

the statements it found to be false materially influenced NIH's decision to renew the T32 grant.[8]

This argument, however, misapprehends the focus of the materiality analysis. In <u>Rogan</u>, the defendant hospital admitted patients through illegal referrals in violation of the Anti-Kickback Act, 42 U.S.C. § 1320a-7b. 517 F.3d at 452. Because of the violation, the defendant was ineligible to receive Medicare payments. The defendant did not deny that it had violated the Act, but instead argued that its failure to disclose information regarding the illegal referrals was immaterial to the government's decision to approve the hospital's Medicare claims, because materiality could only be established if a government

---

[8]   The defendants also argue, however, that the district court erred in interpreting NIH's guidelines as "unambiguous" -- in other words, that to the extent the plaintiff did point to evidence of materiality, that evidence was insufficient to support a jury verdict. Defs. Br. at 52. The defendants note that the renewal application's instructions do not specify what information needs to be included in a progress report, only that the report should include "difficulties" with or "changes" to a grant program. <u>Id.</u> at 53. The instructions do not explicitly state that grantees must report all changes. Because the NIH guidelines are "necessarily ambiguous," defendants argue that the court cannot rely upon these guidelines as a "legal standard for materiality." <u>Id.</u>

But the district court never relied on these guidelines, nor instructed the jury to rely on these guidelines, as a "standard for materiality." The guidelines served instead as evidence that the jury was permitted to rely upon in evaluating what was material to the government in its monitoring of grants. Therefore, we agree with the district court that they provided sufficient evidence from which the jury could reach a conclusion as to materiality. To the extent that these guidelines are ambiguous, it was the jury's function to resolve any disputes about their meaning.

39

employee involved in the decision making process testified that the government would have terminated payments.  Id.

The court rejected this view of materiality, explaining that a "statement or omission is 'capable of influencing' a decision even if those who make the decision are negligent and fail to appreciate the statement's significance."  Id.  As the court stated, "[t]he question is not remotely whether [the applicant] was sure to be caught . . . but whether the omission could have influenced the agency's decision."  Id.

In short, even if a program officer does not subjectively consider a statement to be material, it can be found to be material from an objective standpoint because it is "capable of influencing" the program officer.  Id.  As the plaintiff in this case argues, materiality is "determined not by what a program officer at NIH declares material, but rather [is] based on the agency's own rules and regulations."  Pl.'s Br. at 48.

The Rogan court discussed the purpose of laws prohibiting fraud:

> Another way to see this is to recognize that laws against fraud protect the gullible and the careless -- perhaps especially the gullible and the careless -- and could not serve that function if proof of materiality depended on establishing that the recipient of the statement would have protected his own interests.  The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers;

40

the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth.

517 F.3d at 452 (citation omitted).

We agree with the plaintiff that the test for materiality is an objective one. It does not require evidence that a program officer relied upon the specific falsehoods proven to have been false in each case in order for them to be material. The fact-finder must determine only whether the proven falsehoods have a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

To decide otherwise -- that materiality must be established in each case based on the testimony of a decisionmaker -- would subvert the remedial purpose of the FCA. The resolution of each case would depend on whether such a decisionmaker could be identified and located, and whether that particular person would have treated the claims as material, regardless of whether they were one of several individuals charged with evaluating the claims at issue.

The defendants' contention would also render the language of the statute superfluous. If no one other than an actual decisionmaker could determine whether a statement had a "natural tendency to influence" payment, the statute could have provided that a statement is "material" if it actually influenced a decision maker who was aware of the statement.

41

Our conclusion finds support in other areas of the law. In TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976), for example, the Supreme Court addressed the meaning of "materiality" in the context of a suit brought under the federal securities laws. The Court determined that a fact is "material" if there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." Id. at 448.

> As an abstract proposition, the most
> desirable role for a court in a suit of this
> sort . . . would perhaps be to determine
> whether in fact the proposal would have been
> favored by the shareholders and consummated
> in the absence of any misstatement or
> omission. But as we [have] recognized . . .
> such matters are not subject to determination
> with certainty. Doubts as to the critical
> nature of information misstated or omitted
> will be commonplace. And particularly in
> view of the prophylactic purpose of the Rule
> and the fact that the content of the proxy
> statement is within management's control, it
> is appropriate that these doubts be resolved
> in favor of those the statute is designed to
> protect.

Id.

The same reasoning applies here. Like the securities laws at issue in TSC Industries, this objective approach ensures that the FCA serves as a robust prophylactic against fraud by putting the question of materiality to the jury, rather than attempting to trace it back to the state of mind of the decisionmaker.

In Bustamante v. First Federal Savings & Loan Association of San Antonio, 619 F.2d 360 (5th Cir. 1980), the

42

plaintiffs alleged that the defendants violated the Truth-in-Lending Act in a loan transaction. The court noted that

> when a security interest [with an exception not relevant here] is acquired in real property which is the residence of the person to whom credit is extended, the borrower has a right of rescission within three business days of either consummation of the transaction or "the delivery of the disclosures required under this section and all other material disclosures required under this part, whichever is later . . . ."

Id. at 362. Here again, the court applied an objective rather than a subjective materiality standard. "[T]o apply a subjective standard to the test for materiality would misperceive the remedial purpose of the Act." Id. at 364. The court concluded that if materiality could be established by a subjective determination of whether or not particular information would affect a credit shopper's decision to utilize the credit, unsophisticated or uneducated consumers would not be sufficiently protected. Id.

Having concluded that the test of materiality in the case before us is objective -- asking what would have influenced the judgment of a reasonable reviewing official -- rather than subjective -- asking whether it influenced the judgment of a reviewer of a proposal in the case at hand -- we agree with the district court that a reasonable jury could have found the defendants' statements to be material to the renewal decisions in the third, fourth, and fifth years of the grant. Based on the

43

stipulations regarding criteria relevant to funding and the testimony at trial, the jury had an ample basis for understanding the grant process based upon which it could determine whether statements that were made or omitted concerning changes to curriculum, personnel and clinical opportunities in the renewal applications had a "natural tendency" to influence NIH's funding decisions. The instructions regarding the grant application and renewal process provided the jury with a clear understanding of what information the NIH considers in evaluating progress reports, such as changes or developments to the program.

The defendants did not inform NIH that not all faculty members identified in the initial grant were "key personnel" in the program. The defendants also failed to inform NIH that several of the core courses listed in the proposed curriculum were never implemented, and that fellows were never evaluated by a training committee. NIH was not informed that the fellows did not have access to research and clinical resources described in the initial grant application. NIH was also not aware that the fellows had very limited access to HIV positive patients in their research. In addition, many of the fellows spent much of their time working on projects unrelated to HIV, such as research into aging and epilepsy, which was not reported to the NIH. We conclude that these facts were more than sufficient to allow a reasonable jury to conclude that had the facts been disclosed they would have had a natural tendency to influence, or would

44

have been capable of influencing, the decision to renew the grant and pay money to the defendants pursuant to it.

We therefore also conclude that the district court did not abuse its discretion in denying the motion for a new trial -- the jury's verdict was not "seriously erroneous" or "a miscarriage of justice." Nimely, 414 F.3d at 392 (internal quotation marks omitted).

III.  Exclusion of Evidence
      Demonstrating NIH's Inaction

The defendants argue that the district court abused its discretion by excluding evidence of NIH's alleged failure to take remedial action in response to the plaintiff's complaints, and that a new trial is therefore warranted.  We review a district court's decision to exclude evidence for abuse of discretion. Schering Corp. v. Pfizer Inc., 189 F.3d 218, 224 (2d Cir. 1999). "We [also] review a district court's denial of a motion for a new trial for abuse of discretion." United States v. Brunshtein, 344 F.3d 91, 101 (2d Cir. 2003), cert. denied, 543 U.S. 823 (2004).

The defendants contend that they should have been permitted to elicit evidence of NIH's relative inaction in response to complaints because it is relevant as to whether or not their statements in the renewal applications were false and material.  Feldman told NIH about the defendants' fraudulent claims and, according to the defendants, the agency saw no validity to the complaints as evidenced by its failure to take

45

action beyond asking Cornell itself to investigate the complaints. The defendants argue that they should have been able to present this evidence to the jury in an effort to persuade it that the statements had not misled the agency. If this evidence was presented, they say, the plaintiff "could then have put on any rebuttal evidence about why the jury should find the statements were false and material despite NIH's lack of reaction when presented with those allegations." Defs.' Br. at 61.

Federal Rule of Evidence 402, provides, inter alia, that "[i]rrelevant evidence is not admissible." The district court reasoned that the evidence in question was irrelevant because the NIH's failure to act in response to Feldman's complaints did not speak to the seriousness of those complaints or the likelihood that false claims had been made. The jury did not have before it the standard that NIH used to determine whether or not action was warranted in response to a funding complaint. "[N]o discovery was conducted concerning the standards these agencies employ to determine the existence of misconduct and whether those standards are at all similar to the elements of an FCA claim." Feldman III, 2010 WL 2911606, at *3, 2010 U.S. Dist. LEXIS 73633, at *7. "Specifically, as to [the plaintiff's] deposition testimony on the NIH decision, [he] does not, and indeed cannot, speak to the standards NIH used to judge the merits of his claims." Id. Without evidence as to what the standards of the agency were for beginning an investigation, the

46

jury could not determine whether the complaints made by Feldman should have instigated one.[9]  Id., 2010 U.S. Dist. LEXIS 73633, at *7-*8.

The defendants further argue that to the extent that the district court excluded evidence of NIH's inaction pursuant to Rule 403, it did so in error.  While ultimately we would be inclined to agree with the district court, we need go no further in our analysis because the evidence was properly excluded under

---

[9]     The defendants point to United States v. Southland Management Corp., 326 F.3d 669 (5th Cir. 2003) (en banc), where the court considered the relevance of the course of conduct between a landlord receiving Section 8 funds and HUD.  The court concluded that the communication between HUD and the landlord demonstrated that "HUD was willing to work with the Owners" on remedying maintenance problems, and that "HUD seemed to recognize that the property's noncompliance was at least partially explained by a lack of funds and nearby criminal activity."  Id. at 677.  Based in part on this pattern of honest and open communication, the court concluded that there could be no FCA liability.  Unlike in Southland Management, there is no indication here that the defendants communicated compliance issues to the government or sought its help in addressing them.  Where the government acts in response to potential false claims, its activity may reveal something about its understanding as to whether those claims were deliberately false or the result of extrinsic factors, as in Southland Management.  But where, as here, there is no evidence of government action, nothing relevant can be ascertained without knowing for which of many possible reasons it did not act.

The defendants also cite United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148 (2d Cir. 1993), in which we stated that "government knowledge may be relevant to a defendant's liability."  Id. at 1157.  Indeed it "may be," but is not here where the significance of the knowledge and the responsibilities of the recipients have not been established.

Rule 402 in any event.  This conclusion was not an abuse of discretion.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.